R. Hall McCormick, Trustee, Appellee, v. The Unity Company, Appellant.

Gen. No. 14,126.

1. BONDS—*when obligor estopped to deny validity of obligations.*
*Held,* under the evidence in this case, that the obligor of bonds secured by trust deed was estopped to deny that the same were valid and enforceable obligations.

2. BONDS—*when obligor estopped to deny validity of obligations.*
An obligor having received the benefit of bonds cannot question their validity or assert that they were wrongfully disposed of by its officers.

3. SOLICITOR'S FEES—*when allowance of, not unreasonable. Held,*
that an allowance in a foreclosure proceeding of $7,308 as solicitors' fees, was not, under the evidence, unreasonable.

4. CORPORATIONS—*when estoppel to question authority of official acts arises.* Where directors have allowed a particular officer to control and conduct the affairs of the company without protest or objection, the law presumes that all of such directors knew of or acquiesced in what such officer has done and treats such acquiescence as equivalent to formal authority.

Foreclosure. Appeal from the Circuit Court of Cook county; the Hon. JULIAN W. MACK, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1907. Affirmed. Opinion filed July 14, 1908. Rehearing denied July 24, 1908.

Statement by the Court. The bill in this case was filed to foreclose a trust deed dated January 1, 1895, conveying the Unity building and leasehold to secure certain bonds, one hundred of which bonds numbered 301 to 400, both inclusive, of the issue of January 1, 1895, are in issue here.

The trust deed and bond in dispute originated by virtue of the following resolution:

"Minutes of a meeting of the board of directors of the Unity Company held December 13, 1894, at the office of the Company, 1420 Unity Building, Chicago, Illinois. Meeting called to order by Mr. Lanehart. In the absence of the president, Charles J. Ford was chosen chairman pro tem. On call of the roll it ap-

peared that the following directors were present: Charles J. Ford, Elmer A. Kimball, Isaac M. Kuebler and John W. Lanehart.

The following resolution was introduced by Mr. Lanehart, who moved its adoption:

Whereas, it is deemed advisable to refund the outstanding indebtedness of the Unity Company, issuing new bonds for the purpose of providing money to pay off such indebtedness now outstanding:

Be it, therefore, resolved by the board of directors of the Unity Company, that the president and secretary of said Company are hereby authorized and directed to execute and deliver four hundred (400) principal bonds of this Company, under its corporate seal, in the principal sum of one thousand dollars ($1,000) each, payable in gold coin of the United States of the present standard of weight and fineness, numbered in series from One (1) to Four Hundred (400) inclusively, bearing date January 1, A. D. 1895, and to be payable twenty (20) years from the date thereof, with interest coupons thereto respectively attached, evidencing such interest at the rate of six (6) per cent. per annum, payable in like gold coin, quarter-yearly on the first days of January, April, July and October of each year; such bonds and coupons to be made payable at the Equitable Trust Company in Chicago, Illinois; the proceeds and avails of all such bonds so issued to be used and applied by the officers of this Company to retire all outstanding bonds, notes and other indebtedness of this company; and further that the president and secretary of this Company are hereby authorized and directed to execute and deliver a trust deed or mortgage under the corporate seal of this Company to the Equitable Trust Company as trustee, to secure the payment of said bonds so to be issued and the interest thereon as aforesaid, thereby conveying and pledging for the purposes aforesaid the entire property of the Unity Company aforesaid, now held by said Company or which may hereafter be acquired by said Company.

Be it resolved, that for the better securing of the holders of the bonds of this Company, that said president and secretary shall execute and deliver three hundred (300) of the bonds so issued, which shall be deposited by this Company with The Equitable Trust Company, for the purpose of exchange for an equal number of the bonds of this Company, now outstanding, dated July 1, A. D. 1891, and that said The Equitable Trust Company, trustee, shall be authorized to make such exchange and to certify to and issue the three hundred (300) bonds so to be deposited with it, in exchange for an equal number of bonds of this Company of the issue of July 1, A. D. 1891.

After due and proper consideration, the above resolutions were unanimously adopted. Whereupon the meeting adjourned.

CHARLES J. FORD, President pro tem.,
ELMER ALLEN KIMBALL, Secretary.''

On July 1, 1891, The Unity Company, appellant corporation, made its trust deed to secure four hundred bonds of that date for one thousand dollars each, of which three hundred were issued and disposed of and the other one hundred bonds were afterwards cancelled. This trust deed was made to the Jennings Trust Company, whose name was afterwards changed to The Equitable Trust Company, as trustee, and conveyed appellant's leasehold estate in lots 4 and 5 in Assessor's Division of Original Lots 3, 4 and 5 in Block 37, in the Original Town of Chicago, created by a lease for the term of ninety-nine years from May 1890, made January 25, 1890, by Tobias C. Richardson as lessor to John P. Altgeld as lessee, which lease had been assigned to appellant by Altgeld and wife on June 15, 1891. This trust deed is hereinafter referred to as the first mortgage.

The Jennings Trust Company had agreed to take these bonds at ninety-five cents on the dollar, and by resolution of the directors the president and secretary of appellant were authorized to execute a contract with

the Trust Company for the sale of the bonds, and providing that the proceeds thereof were to be used by The Unity Company for the purpose of erecting a building on the above described premises.

This agreement was subsequently modified to the extent of reducing the authorized loan from $400,000 to $300,000; and 300 of the bonds were delivered to the Trust Company and the other 100 were cancelled.

On January 1, 1895, appellant executed another trust deed to The Equitable Trust Company, as trustee, under the above resolution, covering the same property, to secure another issue of four hundred bonds of that date for $1,000 each, of which three hundred bonds were reserved to be exchanged for the three hundred outstanding first mortgage bonds as contemplated by the above resolution, but were never in fact exchanged or issued, and the remaining 100 bonds were certified, issued and disposed of.

In 1899 The Equitable Trust Company, as trustee under the first mortgage, instituted a suit in the Circuit Court of Cook county to foreclose their mortgage, and that suit resulted in a decree of foreclosure entered on October 11, 1901. This decree was afterwards affirmed by the Supreme Court in the case of the The Unity Company vs. The Equitable Trust Company, 204 Ill. 595. The holders of ninety-three of the second mortgage bonds now in question and afterwards acquired by McCormick, Trustee, appellee herein, were parties defendant to that suit, and such bonds and the second mortgage were adjudged by the decree to be valid obligations and to constitute a lien upon the mortgaged property. Under that decree a sale of the mortgaged premises was made on January 11, 1904, to Herbert W. Holcomb, who acted for the trustee, for the sum of $240,000. On December 29, 1904, Albert M. Johnson, as owner of said ninety-three second mortgage bonds, duly redeemed from the sale by paying $253,920, the amount necessary for the purpose, and shortly afterwards, appellee McCormick, as trustee

of the estate of Leander J. McCormick, deceased, purchased said ninety-three bonds and the certificate of redemption, paying Johnson therefor the sum of $350,-348.07.

On January 3, 1905, interest on said ninety-three bonds having been defaulted, McCormick as trustee instituted the present suit to foreclose the second mortgage for the purpose of realizing the amount due him, both on account of the redemption and upon the ninety-three bonds so purchased. The Unity Company and the trustee of the mortgage were made defendants to the bill, and as McCormick only held ninety-three of the one hundred outstanding bonds, the unknown owners of the other seven bonds were likewise made defendants, as were also some persons holding judgment liens subordinate to the mortgage. Charles C. Adsit came in and answered the bill as one of the unknown owners, admitting the truth of its allegations and averring that he was the owner and legal holder of five of the seven bonds, whose ownership was stated by the bill to be unknown to the complainant.

After all the answers and replications were filed, the cause was referred to a master in chancery to take proofs and to report his findings and conclusions thereon. . During the progress of the case before the master, appellee McCormick produced and offered in evidence two bonds in addition to the ninety-three which he claimed in the bill of complaint to own, and thus the entire one hundred outstanding bonds were accounted for, ninety-five being held by McCormick as trustee and five by Adsit. As to the two bonds offered in evidence by McCormick, it was stipulated that they "may be offered in evidence by the complainant the same as if they had been properly described in the bill of complaint heretofore filed herein, and the necessary allegations made in the bill for that purpose."

The master filed his report on November 30, 1906, recommending a decree of foreclosure as prayed for by the bill. To this report one exception was filed by

appellee McCormick, setting forth that the master should have allowed him interest at 6 per cent. per annum on the redemption money instead of 5 per cent. Appellant filed many objections to the report, and the objections were ordered to stand as exceptions. On final hearing of the cause a decree was entered July 1, 1907, approving and confirming the master's report in all respects, except that the decree allowed complainant 6 per cent. per annum on the redemption money and reduced the allowance given by the master for complainant's solicitor's fees from $10,000 to $7,308. This decree ordered a sale of the property to pay complainant $290,960.48, being the amount of the redemption money, with interest at 6 per cent. per annum from the date of redemption to the date of the decree, and also to pay complainant $146,165.78, being the amount of principal and interest due on the ninety-five bonds held by complainant, and also to pay Adsit $8,325.92, it being the amount of principal and interest due on the five bonds held by him, and also to pay said solicitor's fee of $7,308 and certain other sums that were taxed as part of the costs.

The bill, after stating that it was filed on behalf of all holders of the outstanding bonds of 1895, sets forth the making of the mortgage, the execution of the 400 bonds to be thereby secured, the fact that 300 of such bonds, numbered from 1 to 300, both inclusive, were deposited with the trustee to be used in retiring the 300 first mortgage bonds, but were never so used or issued; the fact that the remaining 100 of the second mortgage bonds were certified and issued and were outstanding; the material fact concerning the suit foreclosing the first mortgage, including the fact that the then holders of the 93 bonds were parties defendant to that suit and appeared therein; the foreclosure sale; the redemption by Johnson on December 29, 1904, when he was the legal holder of said 93 bonds; the subsequent acquisition of McCormick from Johnson of said 93 bonds, and the certificate of redemption, and the

default in interest entitling McCormick under the terms of the mortgage to elect and his election that all the bonds should become due at once and to foreclose.

It is unnecessary to state the contents of the answers filed by the several defendants to the bill, except that of The Unity Company, appellant.

By its answer The Unity Company admits the making of the second mortgage, the signing and sealing of the 400 bonds pursuant to authority of its board of directors, and the deposit with the trustee and the non-issuance of 300 of such bonds; denies that the remaining 100 of the bonds have been by the defendant issued or disposed of for value; denies that the 93 bonds claimed to be held by McCormick were in fact held or owned by him; denies that the other of the bonds were ever issued and disposed of for value by this defendant to any person; alleges that none of the 100 bonds were ever disposed of by this defendant for value; states as to the allegations of the bill to the effect that it was determined in the suit foreclosing the first mortgage, that 64 of the bonds now held by McCormick were then held and owned by Edwin A. Potter, as receiver of the National Bank of Illinois; that Potter held such bonds under and by virtue of a collateral agreement made by and on behalf of John P. Altgeld and John W. Lanehart with the National Bank of Illinois, and by and on behalf of a certain collateral agreement made by Lanehart with E. S. Dreyer & Company, and by and on behalf of a collateral agreement between Altgeld and the National Bank of Illinois. The answer denies or puts complainant to proof of all other allegations of the bill, and avers that the mortgaged premises are worth $750,000.

On May 2, 1907, The Unity Company obtained leave to file an amendment to its answer instanter, without prejudice to the proceedings already taken. At that time the evidence had been taken before the master and the report of the master had been filed in court, and the final hearing upon the exceptions to the master's

report was in progress. Appellant filed an amendment alleging that the 100 second mortgage bonds numbered 301 to 400 were issued and disposed of wrongfully by the officers and agents of the defendant without authority and right from the defendant, and were disposed of for the purpose of procuring credit to themselves as individuals and for a purpose which was *ultra vires* and beyond the charter powers of the corporation.

Appellant prosecutes the present appeal to reverse the decree of the Circuit Court.

ROGERS & MAHONEY and CHILTON P. WILSON, for appellant.

ISHAM, LINCOLN & BEALE, for appellees.

MR. JUSTICE SMITH delivered the opinion of the court.

It appears from the records of The Unity Company, appellant, that said company was organized in March, 1891, by John P. Altgeld, with a capital stock of $1,000,000, consisting of 10,000 shares of $100 each. Ford, Lanehart, Altgeld and Kuebler subscribed for one share each and Kimball, the attorney who drew the papers at Altgeld's request, subscribed for 9,996 shares, but shortly afterwards assigned 9,993 of the shares to Altgeld on the subscription book of the Company. The five subscribers were elected directors for one year, and the first officers were Lanehart, president; Ford, treasurer; and Kimball, secretary.

The record shows that on June 15, 1891, Altgeld and wife transferred to the Company the 99-year lease of the premises on which the Unity Building was afterwards built. Kimball, who always had been and still is secretary of the Company, testified that at the time he transferred the 9,993 shares to Altgeld, the latter stated that if the Company would issue to him the stock he would put up the building and transfer the building and leasehold over to the Company, subject to such mortgage as they might determine to place upon the

property.  Kimball also testified that there was a general conversation among the directors at the time that the funds raised from the $400,000 of first mortgage bonds should be deposited to John P. Altgeld's credit, and that he would check out of those funds and out of any of his own funds to pay the bills for constructing the building.

The witness Oliver testified that Altgeld told him in the spring of 1891, at the time when Altgeld was borrowing money of Oliver to aid in the construction of the building, that he, Altgeld, had organized the Company and was going to turn over his leasehold to it, and that the Company was going to make a bond issue of $400,000, and that he, Altgeld, was to build the building and was to get all the capital stock and bonds.  In 1904, when Oliver was trying to buy some of the second mortgage bonds, Kimball told Oliver that the Company's record book had been lost and that before the transfer of the lease there had been an agreement between Altgeld and the Company whereby Altgeld was to assign the lease and build the building, and as a consideration therefor was to receive all the stock, together with a bond issue of $400,000.

Kimball testified that he had always supposed there had been such an agreement set out in the lost minute book, but after the minute book had been found he noticed that it had not been set out therein, and that this surprised him very much, as he had supposed the Company had in fact held all the meetings they should have held.

On June 17, 1891, a meeting of the stockholders was held authorizing the acceptance of an offer made by the Jennings Trust Company, now The Equitable Trust Company, to make a loan of $400,000 on the leasehold, for the purpose of constructing the building, and on the same day the board of directors of appellant Company authorized the issuance of the first mortgage bonds for that amount.

On June 27, 1891, an agreement was made with the

Jennings Trust Company whereby it undertook to purchase all of the proposed $400,000 of first mortgage bonds at 95 cents on the dollar.

After the mortgage and bonds were executed under date of July 1, 1891, Altgeld went ahead and built the building, and he did this in his own name. Kimball testified that Altgeld attended to all the financial affairs and never made any report to the directors and was not called upon for any; that Altgeld and Lanehart attended to everything and had full authority to pay all bills; that Altgeld's personal checks paid for the building, that the Company itself never paid anything; that he, Kimball, did not know when the Company first had a bank account in its own name, and had nothing to do with any money received during the first year of the Company's existence; that the proceeds of the first mortgage bonds were used in constructing the building; that as such proceeds were received Altgeld deposited them in his own bank account and then paid the bills as he could—a thing which Lanehart knew, because Lanehart had charge of Altgeld's bank account in the latter's absence; that Altgeld expended on the building more than the avails of the first mortgage bonds, and personally put into the building all the additional money that was expended; that Altgeld's course in erecting the building and paying all the bills was in pursuance of the arrangement whereby he was to do so and received the stock and bonds as consideration therefor, and that the proceeds of the first mortgage loan was turned over to him under that arrangement and with the knowledge of the directors. Oliver testified that the $70,000 which Altgeld borrowed from him in 1891 went into the construction of the building, as did $350,000 of Altgeld's personal fortune.

In August, 1891, Altgeld was elected president in place of Lanehart. Of the four directors Lanehart was Altgeld's brother-in-law; Ford was also his brother-in-law, Kuehler was the bailiff in the court of which Alt-

geld was judge, and he had a little grocery business in Palestine, Illinois; and Kimball, the secretary, was a young attorney who drew the organization papers and who, after the building was finished, had only the duties of writing up the minutes of the meetings and collecting delinquent rents. No stock was ever issued to Ford or Kuebler, under their subscriptions. It appears from stubs of the only stock certificate book that the Company had, that from the time of the Company's organization down to the time of Altgeld's death, in 1902, Altgeld held of record 9,740 shares; the Sextons 150 shares; Lanehart 105 shares, and Kimball 5 shares of the 10,000 shares constituting the entire capital stock of the Company.

The Company never had any by-laws, and no stockholders' or directors' meetings were held except those which had to do mainly with the authorization of the two bond issues.

It appears that before McCormick, appellee, purchased the 93 bonds of the Company, he employed as his attorney Mr. A. M. Pence, who examined the records of the former foreclosure suits, and that it was upon his advice that appellee McCormick purchased the bonds. The record contains no evidence showing or tending to show that at the time appellee McCormick purchased the bonds he had any knowledge of how the bonds were originally put in circulation. No evidence was offered that either McCormick or Adsit at the time of their acquisition of the bonds held by them, had any knowledge or notice of any claim by the Company or any of its officers, directors or stockholders that the bonds were wrongfully issued, or that any defense to them existed.

From the evidence shown in the record we are of the opinion that when the appellant company was organized by Altgeld it was for the purpose of facilitating the issue and sale of securities upon which he could borrow the necessary funds with which to erect the building upon his leasehold above described. The cap-

ital stock of appellant was all subscribed for in his interest and was either assigned to him or held for him. We think that, notwithstanding the meagre records of the Company and the death of Altgeld and Lanehart, who knew all the facts connected with the organization of appellant company, and the issue and disposition of its securities and the agreement or agreements between the appellant and Altgeld, it clearly appears from what was actually done, and the testimony in the record, that Altgeld organized appellant company for the purpose stated above; and that the agreement and understanding between Altgeld and the appellant company, through its directors, was that Altgeld was to transfer his leasehold to the company and erect the building thereon in payment for its capital stock, and that the appellant was to issue at least $400,000 in bonds and turn them over to him or the proceeds thereof, which were to be used by him in the erection of the building. The record shows, we think, that this agreement was substantially carried out in good faith by Altgeld, and that from the funds borrowed upon the faith of the securities issued by appellant and from his own private funds Altgeld erected the building in question.

The evidence further shows, we think, that the proceeds of the securities issued by appellant were all applied to the erection of the building, and in addition thereto Altgeld contributed for that purpose large sums of money from his private resources. In our opinion the contention of appellant that the bonds in question were unlawfully issued and disposed of for the private and individual benefit of Altgeld, and not for the benefit of appellant, is not sustained by the record.

When The Equitable Trust Company refused to purchase more than 300 of the bonds of the 1891 issue and the remaining 100 were cancelled, Altgeld was deprived of the proceeds of one hundred of the bonds to which he was entitled under the arrangement; and without doubt the intention of the issue of the bonds in

January, 1895, under the resolution quoted in the statement preceding this opinion, in which it was provided that 300 of the bonds should be deposited with The Equitable Trust Company for the purpose of exchange for an equal number of the 1891 bonds, was to increase the loan and thereby to deliver to Altgeld the full amount of the securities originally agreed to be issued on the property.

After the building was completed by Altgeld, in the spring of 1892, it was turned over to the appellant company, which, up to that time, had taken no part in the business of constructing the building.  It had no bank account, and had paid no money to contractors and material men.  Upon receiving possession of the building, the appellant proceeded to rent it and collect the rents and manage the property.  It paid interest on the bonds in question for four and one-half years, that is to say, the interest that accrued during 1895, 1896, 1897 and 1898 and the first half of 1899. Appellant opened books of account and a bank account and these payments of interest were duly entered in its books in the regular course of business.  The Company received the cancelled coupons and kept them in the Company's vault in its office among its papers.  During 1895 and 1896 there were five directors living, and unquestionably the active directors: Altgeld, Lanehart and Ford, all of whom died before this bill was filed, knew of the interest payments on these bonds, for they all occupied the offices of the appellant company during those years.  Lanehart died in the latter part of 1896, but the vacancy created by his death was never filled. Altgeld certainly, and probably Ford, knew of the interest payments made for the years 1897, 1898 and 1899.  The remaining two directors, Kuebler and Kimball, had nothing to do with any of appellant's disbursements or financial matters.  They testify that all these matters were left entirely to Altgeld and Lanehart.

These facts, in connection with the allegations and

issues and the decree in the foreclosure proceedings upon the bonds and trust deed of 1891, appearing in the record, estop appellant, in our opinion, from denying that the bonds held by appellees are valid obligations against it. Ragland v. McFall, 137 Ill. 81, 91; Hartford Deposit Co. v. Calkins, 109 Ill. App. 579, 584. The directors having allowed Altgeld and Lanehart to control and conduct the affairs of the company, without protest or objection, the law presumes that all of them knew of and acquiesced in what was done, and treats such acquiescence as equivalent to formal authority. Smith v. Smith, 62 Ill. 493, 496; 1 Morawetz on Private Corporations, sec. 538; Taylor on Private Corporations (3rd Ed.), sec. 237; 4 Thompson on Corporations, 4883; Martin v. Webb, 110 U. S. 7.

Moreover, the evidence in the record shows that the bonds in question were used for the benefit of the appellant, when they were originally issued. Having received the benefit of these bonds appellant cannot now question their validity or assert that they were wrongfully disposed of by its officers. Pomeroy v. New York, etc., Co. (N. J. Eq.), 48 Atl. Rep. 395.

Upon a consideration of the record we are of the opinion that the allowance of $7,308 for solicitors' fees was not unreasonable. We think also that the decree is not erroneous in allowing interest at the rate of six per cent. on the redemption money, for the reason that the first mortgage bonds bore that rate of interest, and further, the party redeeming was obliged to pay that rate upon the amount of the sale. Moshier v. Norton, 83 Ill. 519; Harper v. Ely, 70 Ill. 581; McMillan v. James, 105 Ill. 194, 203.

In our opinion, the decree is just and without error, and must be affirmed. The cost of the supplemental abstract of record prepared by counsel for appellee must be taxed against appellant.

*Affirmed.*