LEDGERWOOD v. DASHIELL et al. †
(No. 5496.)

(Court of Civil Appeals of Texas. San Antonio. June 9, 1915. On Motion for Rehearing, June 25, 1915.)

1. BANKS AND BANKING ☞102—"CASHIER"—AUTHORITY.

The "cashier" of a bank is its chief executive officer, and is an agent of the bank; but, where he exceeds his authority, his acts are not binding on the bank.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 239–243; Dec. Dig. ☞102.

For other definitions, see Words and Phrases, First and Second Series, Cashier.]

2. PRINCIPAL AND AGENT ☞100—AUTHORITY OF AGENT—"CARRY ON BUSINESS."

An agent with authority to carry on a business has no authority to pledge or mortgage the

---

property in his possession, for the phrase "to carry on," when applied to business, means to prosecute; to continue.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 262–273, 345, 364, 368–373; Dec. Dig. ⊂⊃100.

For other definitions, see Words and Phrases, First and Second Series, Carry on Business.]

3. BANKS AND BANKING ⊂⊃104—AUTHORITY OF CASHIER—TRANSFER OF BANK'S ASSETS.

A cashier of a bank, with mere authority to do all things necessary to the management and carrying on of the banking business, has no authority to assign the assets of the bank for the benefit of a part of the creditors to the exclusion of others.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 244–248; Dec. Dig. ⊂⊃ 104.]

4. BANKRUPTCY ⊂⊃138—TRUSTEE IN BANK-RUPTCY—UNSECURED CREDITORS—RIGHTS OF PARTIES.

Where a private banker was insolvent when receiving deposits, and he practiced no fraud to secure the deposits, depositors, not otherwise entitled to a lien on the assets of the bank, were common unsecured creditors, and the trustee in bankruptcy of the banker was entitled to the assets as against the depositors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 193–204, 206–209; Dec. Dig. ⊂⊃ 138.]

On Motion for Rehearing.

5. BANKRUPTCY ⊂⊃100—FILING OF PETITION —EFFECT.

The filing of a petition in bankruptcy is a caveat, and, on adjudication, title is vested in the trustee who takes the property as of the time of filing the petition to administer it under the bankruptcy law.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 60, 131, 141–144; Dec. Dig. ⊂⊃ 100.]

Appeal from District Court, Leon County; S. W. Dean, Judge.

Action by B. D. Craig and others against B. D. Dashiell, who impleaded H. O. Ledgerwood, trustee in bankruptcy of C. Thompson, E. R. Thompson, and the Citizens' Bank of Medicine Mound, who claimed funds in controversy as trustee. From a judgment for plaintiffs, the trustee in bankruptcy appeals. Reversed and rendered.

George W. Steere and Ocie Speer, both of Ft. Worth, for appellant. M. C. H. Park, of Waco, for appellees.

CARL, J. B. D. Craig and a number of other persons, as plaintiffs, sued B. D. Dashiell and H. O. Ledgerwood, trustee of C. Thompson, E. R. Thompson, and Citizens' Bank of Medicine Mound, bankrupts, and alledged substantially that Dashiell, as their attorney, had received certain money, notes, and bank furniture, etc., from the Citizens' Bank of Flynn for their benefit pro rata, and refused to turn same over to them; that Ledgerwood was the trustee in bankruptcy of C. Thompson, E. R. Thompson, and the Citizens' Bank of Medicine Mound and was asserting claim to the property in the hands of

Dashiell, as trustee of said bankrupt estate, etc.

The petition also charges that C. Thompson had organized a private bank at Flynn, in Leon county, Tex., with A. M. Beeman, as cashier, and in the organization of the same represented that both he and Beeman had ample capital, and that both of them had the integrity and ability to conduct safely such a business, and petitioners believed such representations, and deposited their money in said Citizens' Bank of Flynn; that, soon after the organization of said bank, Thompson withdrew all the money he had placed therein; that the representations made by Thompson and Beeman were false and made for the purpose of inducing the plaintiffs and others to deposit their money in said bank. It is further pleaded that on April 4, 1911, the bank transferred and delivered to B. D. Dashiell, for plaintiffs' use pro rata, the safe, furniture, and fixtures, together with the notes and other obligations due the bank for money loaned, as well as all books, papers, etc.

The instrument which is claimed to be the assignment of the assets of the bank was written on the back of a list of the notes, and is as follows:

"The notes itemized on the reverse side hereof, are this day transferred and delivered to B. D. Dashiell, as attorney for the depositors of the Citizens' Bank and subscribers for stock in the Citizens' State Bank, to be held and disbursed for him for the benefit of depositors and subscribers, this April 4, 1911.

"[Signed] A. M. Beeman."

Dashiell answered, admitting that he received the notes and other property substantially as alleged, and showed that he received $117 in cash, of which he paid Vestal $63, and shows that he had collected of the notes $946.43, and $4.70 net from sale of the typewriter, and he still had on hand the safe. He alleged further that since the filing of the suit H. O. Ledgerwood, trustee of C. Thompson, E. R. Thompson, and Citizens' Bank of Medicine Mound, had made demand on him for possession of all the property he received from the Citizens' Bank of Flynn, that he had been to an expense in attending the bankruptcy court at Ft. Worth and in the prosecution of this suit, and prayed that the court determine to whom this property belonged, and that compensation for him and his attorneys be fixed, as well as other administration expenses.

Ledgerwood, trustee in bankruptcy, answered and specially pleaded the bankruptcy proceedings, in regard to C. Thompson, E. R. Thompson, and the Citizens' Bank of Medicine Mound, his own appointment and qualification as trustee April 13, 1911, and that he had made demand for this property, which was refused. This answer further alleged that the plaintiffs were simple, unsecured, common creditors of the bankrupt, and that title and the right of possession of said

property had been in him since April 13, 1911. We should also state that this answer questioned the jurisdiction of the trial court, claiming that the federal court had acquired jurisdiction, and further that the plaintiffs had no lien on the property and were not entitled to any. It further charged that Beeman was without authority to turn over the assets of the bank to Dashiell; that the transfer was without any authority from Thompson and was not done as agent, and such attempted transfer was made with full knowledge on part of plaintiffs of his lack of authority. It is shown that the bankruptcy proceeding is still pending.

The trial was before the court without a jury, and judgment was rendered in favor of the plaintiffs in accordance with their prayer. The trustee in bankruptcy, Ledgerwood, has appealed.

The second assignment challenges the authority of A. M. Beeman to make the transfer of the property of the bank to Dashiell as he did on April 4, 1911.

The only one of the depositors who testified was T. A. Cozert. The substance of his testimony will be gathered from the following excerpt:

"The first man that came there in regard to organizing it was C. Thompson. He came to us and told us his business, and said he wanted to come in there and organize a bank, and he stayed around there something like a week, and we wouldn't have anything to do with him, he being a stranger, and he had a bankers' journal of the Northern district of Texas, showing that he was president of the Bankers' Association of that district, and showed up his character as a banker, and finally he got me to go around in a buggy with him to meet the people and talk the banking business up, which I did one day, and he said before he would organize the other bank he would start a private bank there, and he did and called himself the Citizens' Bank, and we did a little business with him. He didn't stay there. He stayed there a few days until Mr. Beeman came in. Thompson told me that he had wired Beeman to come, and, when he came, Thompson brought him in and made me acquainted with him and told us he was the man he had for cashier of the bank, and that he would run the bank, and he talked all the time that Beeman was the man he wanted to be cashier of the State Bank. He is the man that Thompson told us was his cashier. Thompson didn't stay there all the time. He left a few days after he got the business straightened up. To my knowledge, Beeman stayed there and accepted deposits and acted in every way for the bank in the payment of checks drawn on it. He stayed there all the time in banking hours. The Citizens' Bank began business in October or November; I don't remember exactly. It lasted until along in March of the next year. It began in 1910 and wound up in 1911. I was present at the conversation with Mr. Dashiell and Beeman at Nuby. I was with the ones that went to Nuby to meet Mr. Dashiell. Mr. Beeman went with us on that trip. He was represented as cashier of the bank on that trip."

It will be seen that Thompson was the man who was organizing the bank, and not Beeman. No witness undertakes to say that Beeman entered into the organization or was at all considered, except that Thompson told them he was to be the cashier. Before they were ready to organize a state bank at Flynn, and to fill in that interval with a banking institution in the thriving village of Flynn, Thompson very kindly agreed to put in a private bank of his own, and told the citizens that Beeman would be his cashier. Cozert says:

That Thompson told him and them that he was a regular banker, had worked in that business all his life, and claimed that he was with a string of banks, which would help the business. "He told me that he could take $4,000 or $5,000 and put in a little banking business until they got the State Bank on foot. He stated that he had money to operate it, to operate this private bank until the State Bank was organized."

No witness undertakes to say that Beeman had any interest whatsoever in the bank, except to act as cashier, and he was put there by Thompson for that purpose. He drew a salary as such, which was shown by the books of the concern. The record shows that the depositors were considerably wrought up when they discovered the condition the bank was in, but Thompson, the man upon whose credit the money was put there, was the object of their wrath, and not Beeman, whom Dashiell considered a mere "greenhorn."

[1] Then, since Beeman was only an employé and not shown to be further interested, it becomes material to inquire whether he had the power to make the assignment of the bank's assets he attempted to make, when he executed the paper to Dashiell as attorney for some of the creditors, as above quoted. No particular authority is claimed for Beeman, except in his capacity as cashier, and, if he did not have such power by virtue of his position, he did not have it at all. The cashier of a bank is its chief executive officer, and yet he is an agent of the bank, and it has been held that, if he exceeds his authority, his acts will not bind the bank. Arnold v. National Bank of Waupaca, 126 Wis. 362, 105 N. W. 828, 3 L. R. A. (N. S.) 580, 77 Am. Dec. 759, note; Martin v. Webb, 110 U. S. 7, 3 Sup. Ct. 428, 28 L. Ed. 49.

[2, 3] And if it be conceded that Beeman was fully authorized to do any and all things necessary to the management and carrying on of the banking business at Flynn, in the absence of express authority to do so, he would not be authorized to close out the business by making an assignment of the bank's assets. An agent who is authorized to manage and carry on a business is not empowered thereby to pledge or mortgage the property in his possession, for that is not carrying on the business. It is placing the business at the will and pleasure of the mortgagee. Mechem on Agency, vol. 1, p. 724, § 1004; First National Bank v. Hicks, 24 Tex. Civ. App. 269, 59 S. W. 842.

The meaning of the phrase "to carry on," when applied to business, is well settled. In Worcester's Dictionary, the definition is "to prosecute; to help forward; to continue, as to carry on a business," etc. Florsheim Bros.

Dry Goods Co. v. Lester, 60 Ark. 120, 29 S. W. 34, 27 L. R. A. 505, 46 Am. St. Rep. 162 (citing Cooper Mfg. Co. v. Ferguson, 113 U. S. 727, 5 Sup. Ct. 739, 28 L. Ed. 1137).

It is said in section 1007, p. 725, vol. 1, Mechem on Agency:

"For similar reasons, a general authority to manage a business or property clearly contemplates, in the ordinary case, that the business is to be continued or the property retained, and not disposed of. Such a power, therefore, ordinarily implies no authority to sell the business."

In Gouldy v. Metcalf, 75 Tex. 455, 12 S. W. 830, 16 Am. St. Rep. 912, there was a power of attorney given which embraced powers as follows:

"In and about my business to buy, sell, or exchange property, to receive and receipt for money, to sell and dispose of property, to give bills of sale thereto, or to sell and transfer real estate and execute deeds thereto, or to do and perform any lawful act in or about or concerning my business, as fully and completely as if I were personally present; and I herein and hereby confirm all their lawful acts and deeds that they perform in any manner connected with my business."

The attorneys in fact, under this instrument, executed a statutory deed of assignment for the benefit of creditors. The Supreme Court said, in passing upon that case:

"We think it clear from the foregoing quotations that an assignment for the benefit of creditors may be made by any agent or attorney in fact authorized thereto. The instrument under which the power was exercised in this case does not in terms grant the authority. The language used in the grant of general power is certainly very comprehensive, but the established rule of construction limits the authority derived by the general grant of power to the acts authorized by the language employed in granting the special powers. 'When an authority is conferred upon an agent by a formal instrument, as by a power of attorney, there are two rules of construction to be carefully attended to: (1) The meaning of general words in the instrument will be restricted by the context, and construed accordingly. (2) The authority will be construed strictly so as to exclude the exercise of any power which is not warranted, either by the actual terms used, or as a necessary means of executing the authority with effect.' Ewell's Evans on Agency, 204, 205; Reese v. Medlock, 27 Tex. 123, 124 [84 Am. Dec. 611]. Applying these rules to this case, and none of the circumstances under which the power was executed being shown, we are of opinion that the attorneys in fact did not have the power to make the assignment, and that the court did not err in so holding."

The case of Lamb v. Cecil was twice before the West Virginia courts. 25 W. Va. 288, and 28 W. Va. 653. In that case, Cecil was a director of the bank, and had a deposit. It became hopelessly insolvent, and, with full knowledge of the condition of the bank, the cashier, acting fraudulently with Cecil, turned over to him some discounted paper in payment of his deposit. Such transfer was held void.

Beeman, in this instance, occupied a dual position of trust. He owed a duty to represent, within the scope of his authority, the interests of C. Thompson, whom the undisputed evidence shows was his principal, for the bank was organized upon the strength of his credit and standing as a banker and a man of means. No witness undertakes to testify to any fact which would show him to be anything but the representative and agent of Thompson. In the second place, Beeman was in a position of trust toward all the depositors. If it should be contended that the emergency was so pressing as not to admit of delay, and that he had the power to make any assignment at all, he would certainly not have the right to make an assignment for the benefit of a part of the creditors to the exclusion of others.

[4] This was not a suit for rescission of the contract, upon the ground of any fraud practiced by Thompson, and no fact is pleaded or proved which would entitle the plaintiffs to a lien of any kind on the assets of the bank. They were common unsecured creditors. And it is not shown that Thompson was insolvent at the time the deposits were made. It is shown that he was adjudged bankrupt on April 13, 1911; but that fact alone would not show that he was insolvent at the times the money was deposited. It is known of all men that insolvency may occur suddenly and ordinarily is not reached by any fixed formula. While bankruptcy may yet reach the dignity of an exact science, the courts, so far as we know, have never recognized any particular method or time by which it is to be obtained.

It therefore follows, from what we have said, that the judgment of the trial court will be reversed and judgment is here rendered that the plaintiffs take nothing by reason of this suit; and that the defendant, Ledgerwood, trustee in bankruptcy of C. Thompson, E. R. Thompson, and the Citizens' Bank of Medicine Mound, do have and recover, as against the plaintiffs and B. D. Dashiell, all of the property or the proceeds thereof which passed into the hands of said Dashiell by reason of the assignment made by the said Beeman.

Reversed and rendered.

### On Motion for Rehearing.

In stating this case, through oversight, we stated that B. D. Craig and a number of others sued B. D. Dashiell and H. O. Ledgerwood, trustee, etc., when as a matter of fact Craig and others sued Dashiell for an accounting as their agent, and he impleaded Ledgerwood, trustee, who came in and claimed the funds in his capacity as trustee. Further, the petition in bankruptcy was filed April 13, 1911, but the final adjudication was not made until November 13, 1911; Ledgerwood qualifying as trustee on December 6, 1911. This correction is made in deference to the request of counsel for appellees, and not that it makes any material difference in so far as the case is concerned. Neither does it make any difference when Ledgerwood qualified as trustee.

[5] "The filing of the petition (in bankruptcy) is a caveat to all the world and, in

effect, an attachment and injunction. * * * And, on adjudication, title to the bankrupt's property became vested in the trustee, with actual or constructive possession placed in the custody of the bankruptcy court. * * * ' The filing of the petition is an assertion of jurisdiction with a view to the determination of the status of the bankrupt and a settlement and distribution of his estate. The exclusive jurisdiction of the bankruptcy court is so far in rem that the estate is regarded as in custodia legis from the filing of the petition. It is true that, under section 70a of the act of 1898 (Act July 1, 1898, c. 541, 30 Stat. 565 [U. S. Comp. St. 1913, § 9654]), the trustee of the estate, on his appointment and qualification, is vested by operation of law with the title of the bankrupt as of the date he was adjudicated a bankrupt; but there are many provisions of the law which show its purpose to hold the property of the bankrupt intact from the time of the filing of the petition, in order that it may be administered under the law if an adjudication in bankruptcy shall follow the beginning of the proceedings. Section 70a, in reciting the property which vests in the trustee, says there shall vest 'property, which prior to the filing of the petition (the bankrupt), * * * could by any means have transferred or which might have been levied upon and sold under judicial process against * * * (the bankrupt).' Under section 67c attachments within four months before the filing of the petition are dissolved by the adjudication in the event of the insolvency of the bankrupt, if their enforcement would work a preference. Provision is made 'for the prompt taking possession of the bankrupt's property, before adjudication, if necessary (section 69a). Every person is forbidden to receive any property after the filing of the petition, with intent to defeat the purposes of the act.' Acme Harvester Co. v. Beekman Lumber Co., 222 U. S. 300, 32 Sup. Ct. 96, 56 L. Ed. 208." Kopplin v. Ludwig, 170 S. W. 106.

The motion is overruled.