MARTIN, Sheriff, & Others *v.* WEBB & Others, Trustees.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.

Submitted December 7th, 1883.—Decided January 7th, 1884.

*Contract—Estoppel—Evidence—Principal and Agent.*

1. Although a cashier of a bank ordinarily has no power to bind the bank except in the discharge of his customary duties ; and although the ordinary business of a bank does not comprehend a contract made by a cashier without delegation of power from the board of directors, involving the payment of money not loaned by the bank in the customary way ; nevertheless : (1.) A banking corporation, whose charter does not otherwise provide, may be represented by its cashier in transactions outside of his ordinary duties, without his authority to do so being in writing, or appearing in the records of the proceedings of the directors. (2.) His authority may be by parol and collected from circumstances or implied from the conduct or acquiescence of the directors. (3.) It may be inferred from the general manner in which, for a period sufficiently long to establish a settled course of business, he has been suffered by the directors, without interference or inquiry, to conduct the affairs of the bank ; and (4.) When, during a series of years, or in numerous business transactions, he has been permitted, in his official capacity and without objection, to pursue a particular course of conduct, it may be presumed, as between the bank and those who in good faith deal with it upon the basis of his authority to represent the corporation, that he has

acted in conformity with instructions received from those who have the right to control its operations.

2. That which directors ought, by proper diligence, to have known as to the general course of the bank's business, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with it upon the basis of that course of business.

*Mr. Eppa Hunton* and *Mr. J. Chandler* for appellants.

*Mr. R. T. Merrick* and *Mr. M. F. Morris* for appellees

MR. JUSTICE HARLAN delivered the opinion of the court.

This is an appeal from a decree in two suits in equity commenced in one of the courts of the State of Missouri and thence removed into the Circuit Court of the United States for the Western District of that State, where, by consent, they were consolidated for final hearing.

The question presented is whether the appellant, the Daviess County Savings Association, a banking corporation of Missouri, doing business at Gallatin, in that State, is, under the circumstances of this case, estopped to deny that the cancellation, in its name and by its cashier, of certain notes secured by trust deeds upon real estate, and the release of record of the liens given by those deeds, was by its authority and binding upon it.

The facts bearing upon this question, as they are disclosed by the pleadings, testimony and stipulations of counsel, are substantially as will be now stated.

On the 30th day of June, 1879, one Patrick S. Kenney was largely indebted to that association. The indebtedness was secured by recorded deeds of trust upon several tracts of land, in some of which, embracing a large part of this indebtedness to the bank, his wife had not joined. These deeds bore date, respectively, February 8th, 1872, November 17th, 1873, Dec. 20th, 1873, August 28th, 1874, September 21st, 1874, May 24th, 1875, and April 1st, 1876. In three of them the trustee was Robert L. Tomlin, who, at the date of their execution and during the entire period covered by the transactions to be hereafter recited, was a director and cashier of the bank. Kenney and wife had also executed and delivered a deed of trust upon a portion of the same lands, for the benefit of

James D. Powers, to secure a debt of $5,000 and interest. As. to the lands therein described, it gave a lien superior to that created by any of the before-mentioned deeds, except the one of date February 8th, 1872.

On the 15th day of July, 1875, and 1st day of November of the same year, respectively, the Exchange Bank of Breckinridge, Missouri, and one Thomas Ryan, obtained judgments for money against Kenney, which, on June 30th, 1879, remained, or were believed by those interested in them to remain, liens superior to that given by the foregoing deed of April 1st, 1876.

It was desired by Tomlin, the cashier, to have Kenney's indebtedness to the bank in better shape than it was, and to secure further time on his indebtedness to other parties. He also deemed it important that the liens upon these lands (whether created by trust deeds or judgments), which were prior to those held by the bank, should be removed, and that Mrs. Kenney's signature be obtained to a trust deed or deeds in favor of the bank, covering all the lands of her husband. He therefore requested Kenney to obtain a loan of money sufficient to satisfy all liens prior to those held by the bank. Tomlin did not wish his bank to make further advancements to Kenney, believing the latter would be more prompt with strangers, than with the bank, in paying interest as it matured. In order to effect the desired result, application was made by the cashier to Frank & Darrow, of Corning, Iowa, for a loan to Kenney. After some negotiations, that firm made an arrangement with Albert S. Webb, R. L. Belknap, and William H. Kane, of New York, trustees under the will of Henry R. Remsen, for a loan of money to Kenney for five years, at eight per cent. interest, to be secured by a trust deed on his lands, which would give them a lien prior and superior to that held by all others, including the bank. It was expressly agreed between Frank & Darrow, representing the trustees of Remsen on one side, and Kenney and Tomlin, the latter representing his bank, on the other side, that the money thus obtained should be applied, as far as necessary, to the debts secured by the before-mentioned Powers deed of trust, and to the two

judgments against Kenney; that the balance should be paid to
the bank, which should then cancel and surrender the notes
held against Kenney, taking a new note from him, and enter
of record satisfaction and release of its liens under the several
deeds; that Kenney and wife should execute a deed of trust,
giving a first lien to Remsen's trustees to secure the loan by
them made; a like deed, giving a lien subordinate to that of
Remsen's trustees, to secure Frank & Darrow in the sum of
$1,000, the amount stipulated to be paid them for effecting the
loan; that Kenney and wife should also make a deed of trust
on the same lands to the Daviess County Savings Association,
giving a lien subordinate to those given to Remsen's trustees
and to Frank & Darrow, for the balance of their claims against
Kenney remaining after crediting such portion of the $10,000
received from Remsen's trustees as should be paid to the bank.

No part of the sum received from Remsen's trustees was
paid directly to or disbursed by Kenney; but, conformably to
the agreement between the parties, $5,200 of it was applied in
satisfaction of the debt secured by the Powers deed of trust,
$1,689.86 in discharge of the two personal judgments against
Kenney, and the balance, $3,110.14, was paid to the bank. A
new note was then executed to the bank by Kenney, and the
$3,110.14 entered on its books as a partial payment thereof.
Satisfaction was entered of record in the name of the bank by
its cashier of all the debts held against Kenney, and the old
deeds of trust held were also cancelled of record in its name
by the cashier. Deeds of trust executed by Kenney and wife,
of date July 1st, 1879, were then placed upon record, all on
August 6th, 1879, but distinctly giving liens upon the lands in
the order already indicated.

The new deed to the bank, in addition, expressly provides
that the lien thereby created is subordinate to that given Rem-
sen's trustees.

The old notes of Kenney were marked by the cashier on the
books of the bank as paid, and the new note entered as the
one Kenney was to pay. The $3,110.14 went into the general
funds of the bank, and was used in its business. The old notes
and deeds, being first stamped by the cashier as "paid," were

placed by him in an envelope marked with Kenney's address. The cashier had promised when this arrangement was consummated to send them to Kenney, but finding the package containing them to be bulky they were held for delivery to him when he should call at the bank.

The Daviess County Savings Association was organized in 1865. Of its paid-up capital stock, at the time of these transactions, all, except a very small amount, was owned by McFerran, Hemry, and Tuggle—McFerran owning a majority of the whole stock. McFerran was elected president, and from some time in 1780 until January 1st, 1872, Tomlin was acting cashier, and from the latter date until January 1st, 1881, he was cashier. At the outset the business seemed to have been managed entirely by the cashier under the general supervision or direction of McFerran. But desiring to extend the field of his business operations the latter removed in 1873 to Colorado, and there engaged in banking business. He did not return to Missouri until February, 1881. During his absence, and up to 1879, he claimed to be the president of the association. But during the whole period of McFerran's absence, the exclusive management of the business of the bank seemed to have been left to the cashier, without interference from any quarter. This state of things continued even after the election of Hemry as president on the 1st day of January, 1879. Tuggle, one of the directors, says he never gave much attention to the affairs of the bank. He resided some distance from Gallatin; came to town about once a month, staying sometimes a week; was in the bank frequently, but never gave much attention to its affairs; when there he would inquire of the officers how it was "running" or "getting along," but he never examined its books, money, or notes; and when in town, did not, he says, do anything about "running the affairs of the bank." He testifies that the meetings of the board of directors were "simply for the purpose of electing officers and declaring dividends." He knew that the business of the bank was varied, presenting itself in different forms; that deeds of trust were taken from time to time; and that in the course of its business it was necessary to cancel such deeds. Upon cross-examination he said:

"Tomlin was attending to the business of the bank from 1873 up to the time this loan was made. . . . When a man applied to the bank for a loan, or to have a deed of trust changed, or the security changed, my understanding was that Tomlin attended to it. . . . I never questioned Tomlin's right to cancel a deed of trust from 1873 to 1879 ; never knew of any other director questioning his right during that time. . . . Tomlin was acting as cashier from 1865 up to the time of making this loan, and, so far as I know, was transacting generally all the business necessary to be transacted here at the bank."

When asked by whom he expected a deed of trust to be cancelled, when executed by one who applied to the bank for a loan, and gave other security, and wished that deed released, his answer was: "I expected Tomlin attended to it." When asked who he supposed had such authority from 1873 to the time of the loan in question, his answer was : "I understood he (Tomlin) was doing it. I never thought much of it, and knew nothing about his authority." Again, the same witness : "My understanding is that Tomlin was doing the business of the bank. Cannot say when it was I first heard of this loan. When I heard it I did not do anything." Hemry, the other director, and who was elected president of the bank for 1879, said that he did not, nor did any individual director, to his knowledge, give orders as to the release of securities. "To be very particular," said he, "I don't think of any particular case in which I directed or advised." It thus appears that from 1873 up to 1880, during McFerran's absence in Colorado, there could have been no supervision of the business by him, and that the local directors surrendered all control to the cashier, who was their co-director. If they did not abdicate all authority as directors, they acquiesced in the cashier's assumption of exclusive management of the bank's business.

Tomlin understood, and from the conduct of the directors had reason to understand, that he was invested with full authority to manage the operations of the bank according to his best judgment, and without disturbing the directors. This explains the fact—which is quite extraordinary in view of the

present position of the bank—that from 1873 to 1880, inclusive, Tomlin, as cashier, entered in the name of the bank, upon the proper records of the county, satisfaction of more than one hundred and fifty different deeds of trust executed to secure debts held by the corporation. In no instance did he receive previous orders to do so from the directors. His authority or duty to do so was never questioned to his knowledge or to the knowledge of any one having business with the bank. To all who came into the bank or had transactions with it his control seemed to be as absolute as if he were the owner of all the stock. His authority to make the arrangement with Kenney, Frank & Darrow and Remsen's trustees was never questioned by any one until February, 1880, when McFerran returned from Colorado on a visit to Missouri. Tomlin during his explanation of the details of that arrangement exhibited to him the old notes and trust deeds, they having remained in his possession in the package in which he originally placed them for Kenney. McFerran took possession of them, claiming that they were the property of the bank, although after the new deed of trust Kenney had given up the land to the bank and took back a lease from it.

The bank, having through Tomlin's management and with the money obtained from Remsen's trustees removed the lien given by the Powers deed of trust, and the lien or the claim of lien upon a part of the lands in virtue of the judgments obtained by the Exchange Bank of Breckinridge and Ryan, now ignores the new deed of trust, and seeks to foreclose the lien given by the original deeds, thereby defeating the prior lien given to Remsen's trustees by the deed of 1879; this, upon the ground that Tomlin as cashier, without authority and without their knowledge, had assumed to discharge the original debts, to cancel the original trust deeds, and to take a new note secured by a new deed of trust. It is to be observed that while the bank repudiates this arrangement, upon the faith of which Remsen's trustees parted with their money, it retains and does not offer to return, but has used in its business $3,110.14 of the sum loaned by those trustees through Frank & Darrow to Kenney. It is willing to accept all the benefits resulting

from the acts of its cashier, but endeavors to escape the burdens attached to it by the agreement of the parties.

We have stated with some fulness the circumstances disclosed by the record, so that the general expressions in this opinion may be interpreted by the facts of this case. To permit the bank, under these circumstances, to dispute the binding force of the arrangement made by its cashier in reference to Kenney's indebtedness, including the cancellation of the old note and trust deeds, and the acceptance of the new ones, would be a mockery of justice. It is quite true, as contended by counsel for appellants, that a cashier of a bank has no power by virtue of his office, to bind the corporation except in the discharge of his ordinary duties, and that the ordinary business of a bank does not comprehend a contract made by a cashier—without delegation of power by the board of directors—involving the payment of money not loaned by the bank in the customary way. *United States Bank* v. *Dunn*, 6 Pet. 51; *United States* v. *City Bank of Columbus*, 21 How. 356; *Merchants' Bank* v. *State Bank*, 10 Wall. 604. Ordinarily, he has no power to discharge a debtor without payment, nor to surrender the assets or securities of the bank. And, strictly speaking, he may not, in the absence of authority conferred by the directors, cancel its deeds of trust given as security for money loaned—certainly not, unless the debt secured is paid. As the executive officer of the bank, he transacts its business under the orders and supervision of the board of directors. He is their arm in the management of its financial operations. While these propositions are recognized in the adjudged cases as sound, it is clear that a banking corporation may be represented by its cashier—at least where its charter does not otherwise provide—in transactions outside of his ordinary duties, without his authority to do so being in writing, or appearing upon the record of the proceedings of the directors. His authority may be by parol and collected from circumstances. It may be inferred from the general manner in which, for a period sufficiently long to establish a settled course of business, he has been allowed, without interference, to conduct the affairs of the bank. It may be implied from the conduct or acquiescence of the cor-

poration, as represented by the board of directors. When, during a series of years or in numerous business transactions, he has been permitted, without objection and in his official capacity, to pursue a particular course of conduct, it may be presumed, as between the bank and those who in good faith deal with it upon the basis of his authority to represent the corporation, that he has acted in conformity with instructions received from those who have the right to control its operations. Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect the officers of the bank, and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business.

These principles govern the case before us, and lead necessarily to an affirmance of the decree adjudging the surrender cancellation of the old deeds and the notes given by Kenney, and declaring the liens in favor of Remsen's trustees and Frank & Darrow to be superior to that of the bank.

*It is so ordered.*