### KNOWLEDGE OF DIRECTOR OF AFFAIRS OF COMPANY.

Circuit Court of Cuyahoga County.

N. P. BOWLER v. ROBERT GARLAND, JOHN W. GARLAND AND CATHERINE G. BAILEY, PARTNERS TRADING UNDER THE NAME AND STYLE OF THE GARLAND CHAIN COMPANY.

Decided, March 18, 1901.

*Corporations—Director Chargeable with Notice as to Financial Condition of Company and Its Business.*

A director of a corporation is conclusively presumed to have knowledge of the financial condition of the company and of the existence and non-performance of a contract of the company which he has guaranteed; he, therefore, can not defend an action upon such guaranty, upon the grounds that he was not given notice of default on the part of the company until it had become insolvent, or that the time for the performance of the contract had been extended without his knowledge or consent.

*White, Johnson, McCaslin & Cannon,* for plaintiff in error.
*Louis J. Grossman,* contra.

CALDWELL, J.; MARVIN, J., and HALE, J., concur.

On the 6th of June, 1895, the Garland Chain Company entered into a contract by which the Cady Manufacturing Company agreed to furnish two machines for making chain—one for making Eureka chains, and one for making pump chains. The machine for making pump chains was furnished, and this litigation does not pertain to that machine.

For the Eureka chain machine, $1,010 was to be paid. It seems that this was not a known machine, but it involved invention, and there seems to have been some doubt in the minds of the contracting parties as to just how soon the machine could be furnished.

The contract provided that the party to receive the machine was to pay at certain times certain money upon the contract and, if the machine was not furnished according to the contract, then this money was to be paid back, and N. P. Bowler guaranteed

the fulfillment of the contract as to paying back the money, in the following words:

"I hereby guarantee that in event of a non-fulfillment of this contract as relates to machine for making Eureka chain, that all money paid in advance on the machine for making the Eureka chain will be returned."

The Eureka Chain Company was insisting upon a more speedy fulfillment of the contract, and the time in which the contract was to be completed had passed, and the parties were corresponding in regard to the matter; the Eureka Chain Company insisting upon having the machine, and the other party delaying, until finally on the 18th of June, the Cady Manufacturing Company sent this telegram:

"Working hard on machine. Probably thirty days. Have written."

And on the same day they wrote this letter:

"The way it looks to me now, I have no doubt but we will be able to fully complete the machine inside of thirty days from date. We think, in fact, we know you will be repaid for all of your vexation and worry when you receive this machine and get it running in your shop."

And on June 18th, 1896, the Garland Chain Company answered the above telegram as follows:

"Your telegram is just received. This telegram is about the twelfth promise you have made of precisely the same nature. We will give you thirty days now to complete the contract and in case the same is not then in such shape that we can know definitely you are working on it with some progress, we will put the matter in the hands of another party and see why a person can enter into a contract without regard to its terms or conditions."

Mr. N. P. Bowler was the grandfather of Mr. George H. Bowler, and he was an owner of stock in the company, and the evidence shows that he was a member of the board of directors, but rarely attended the meetings and knew nothing of the progress being made on the machines.

It is claimed that the evidence shows that at the time the machine should have been completed in November, 1895, and for months afterwards the Cady Manufacturing Company was solvent, and had notice been given Mr. Bowler at that time of the failure of the Cady Manufacturing Company to fulfill its contract, that he could have saved himself from the loss upon his guarantee. And it is claimed he got no notice of such failure to comply with the contract until after the Cady Manufacturing Company had become insolvent, and that whatever he must pay upon this contract, will be a loss to him as he can never make it good with the company. It is claimed from this evidence that Mr: Bowler was discharged:

*First,* by failure to notify him of the default of the company;

*Second,* by the extension of time, or rather, as it is called, *the making of the new contract* in June, 1896, at which time the Garland Chain Company made an offer to the Cady Manu. facturing Company to extend the time thirty days;

*Third,* it is claimed that there was error on the part of the court trying the case, in rulings upon the evidence, to the prejudice of the plaintiff in error; and,

*Fourth,* that even if Mr. Bowler is liable, the judgment was for too large an amount.

I will consider these complaints in the order in which I have named them.

The first is, that Mr. Bowler was prejudiced by not being notified of the failure of the Cady Manufacturing Company to perform the contract within the time limited by the contract, and that by delaying to serve him with such notice until the company became insolvent, he is discharged from his obligation.

Although Mr. N. P. Bowler was a director in the Cady Manufacturing Company he did not attend the meetings of the company except on very rare occasions, and did not have any notice of the solvent or insolvent condition of the company, nor have any notice of the non-fulfillment of this contract.

This was a matter that pertained from first to last to the duties of the directors of the company. It was not a mere matter of business, as shown by the books of account of the com-

pany, but pertained to a contract made by the company and, hence, presumed to be made by the directors of the company, and they were charged with the duty of seeing that it was fulfilled, and of knowing when it was fulfilled. The question to be considered under this head is whether Mr. Bowler must be held to have knowledge of this class of business which pertained to the duties of the directors of the company.

In *Merchants' Bank* v. *Rudolf*, 5 Neb., 527, 540 and 541, the judge delivering the opinion quotes this language from *Morse on Banks and Banking* at 90 and 91, and especially on page 115:

"Whatever knowledge a director has, *or ought to have*, officially, he has, or will be conclusively presumed at law to have, as a private individual. In any transactions that the bank, either on his separate account, or where others are so far jointly interested with him that his knowledge is their knowledge, he and his joint contractors will be affected by this knowledge which he has or which he ought, if he had duly performed his official duties, to have acquired." Citing *Lyman* v. *U. S. Bank*, 12 How., 225.

Then, applying the law to the case before the court, the court say:

"Rudolf and Deck were co-partners and as such signed the note in question. It is a settled rule that notice to one member of a firm is sufficient to bind all the other members. Rudolf was also an active member of the board of directors of the bank and it was his duty to know whether this note was paid or not. The conclusive presumption is that, as a director, he knew it was not paid; this knowledge is chargeable to him as a private person, and also as a member of the firm of A. C. Rudolf & Company."

In *Martin* v. *Webb*, 110 U. S., 7, in speaking of how far the bank was bound by the conduct of its officer, the court say:

"When during a series of years or in numerous business transactions, he (the officer) has been permitted without objection and in his official capacity, to pursue a particular course of conduct, it may be presumed, as between the bank and those who in good faith deal with it upon the basis of his authority to represent the corporation that he has acted in conformity with instructions received from those who have the right to control its opera-

tions. Directors can not, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the conditions of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect officers of the bank, and to make declarations of dividends. That which they ought, by proper diligence to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business.''

In *German Savings Bank* v. *Wulfehuhler*, 19 Kans., 60, the first paragraph of the *syllabus* is:

''A person who holds the office of director and vice-president of a bank and at the same time has private and personal dealings with the bank, is conclusively presumed to know (so far as the same affects his said personal dealings), the general condition and management of his bank, and to know everything of importance that occurs therein, either at the time it occurs, or soon thereafter.''

· The court, on page 63, at the bottom, use this language:

''While we assume, as a matter of fact, that the defendant knew nothing of the condition or management of said bank, yet still as a matter of law we think we must presume that he knew all about these matters. He was a director and the vice-president of the bank, and it was his duty to have such knowledge, and, therefore, the law will conclusively presume that he had it.''

And as dealing very directly upon the knowledge of solvency and insolvency so far as that may be involved, I refer to the case of *Lowry Banking Company* v. *Empire Lumber Company,* 91 Ga., 624, where this language is used:

''As it is the duty of the directors of a corporation to be informed of its condition with reference to solvency or insolvency, they are to be treated as having that knowledge when a mortgage upon its assets is executed with their assent or by their authority.'' *Lane & Co.* v. *Bank of West Tennessee,* 9 Heiskell, 419-437.

In *Greenville Gas Co.* v. *Reis,* 54 O. S., 549, the court say:

"A director of a corporation dealing in its property on his own account, is chargeable with notice of the action of the board of directors as to such property, whether he was present or not at the meeting which took such action."

In this case, a bond was delivered by the board of directors to the president of the corporation in trust for sale, and it was held that the president had no right to convert such a bond to his own use in payment of a claim due him from the corporation. He assigned this to two parties, one of whom was a director and the other a stockholder in the company issuing the bond; the action taken by the corporation in placing the bond in the hands of the president was not known to Reis and he was not present at the meeting when the action was taken by the board of directors and hence he claimed that he stood in the light of an innocent purchaser for value and without notice of the trust. It seems that they had taken this as collateral security to indemnify them against loss as sureties of John Dover, to whom the bond had been transferred. Shuffleton was a director, and Reis was a stockholder, and the record shows that Mr. Shuffleton was not present at the meeting at which the resolution was passed authorizing the issuing of the bonds, and the court holds that that does not aid him. The court says:

"When it comes to dealing in the property of a corporation, the director is charged with notice of all that has transpired at the meetings of the board of directors. He is not allowed in such case to plead ignorance or want of notice or knowledge."

And in laying down the law of the case, the court cited 19 Beav., 97, the substance of which is:

"As regards the directors of a company the case stands on a totally different footing from where it does where the party is a stockholder. A person, when he becomes a director, accepts a trust which he undertakes to perform for the benefit of the company. If in the due performance of that trust, he must necessarily have acquired certain knowledge, it appears to me but fit that he should be charged with the knowledge of those facts which it was his duty to have become acquainted with. It

is merely saying that a person shall be held to know that which it was his bounden duty to know. It appears to me that Mr. Brown was bound to know what took place at the meetings of the board of directors, of which he was a member.''

And Mr. Brown in that case was held to have such knowledge.

There are many other cases in which this doctrine has been laid down and applied to the facts in the case; and from this law we are satisfied that, in law, Mr. N. P. Bowler must be held in this case to have had knowledge of the existence of this contract, of its non-performance, and of the correspondence that took place in regard to its non-performance after the time in which it was to be performed by the terms of the contract; and that he must be presumed to have knowledge of the financial condition of the company at all times involved in this litigation, and according to these authorities, this presumption is one that is conclusive upon him, one that he can not deny; and if this is the law of the case, then the errors complained of as to the rulings of the court on the introduction of testimony are immaterial, as they can in no way affect the conclusion of the law to be drawn in the case at bar. But it is contended by Mr. Bowler that there was an extension of time, which extension took place without his knowledge and without his consent.

The above authorities lead us to the conclusion that, in law, Mr. N. P. Bowler *did* have notice as to the continuance of the time for the fulfillment of the contract, and there is plenty of law which we have seen and examined, going to show that if he is present or not present at the meeting in which a board performs an act and he does not show that he did not assent to that act and that he was not present, that the presumption will be that it was by the *assent of the entire board;* and upon these authorities, we are of the opinion that if there was an extension of time in this case, it would be no defense to Mr. Bowler and that he would be presumed to have assented to the same.

Although this business was not transacted by the board of directors, yet if it was making a new contract, or an extension of a contract, or an extension of time in the contract already made, it is the business of the board of directors, and while they

may delegate the authority to do that business to other officers of the company, yet, in law, they are presumed to have done it themselves, and whatever knowledge they, or any one of them, would have obtained in the performance of that business, they will be charged with such knowledge in questions arising out of the same. If there was a new contract in this case, and supposing that the directors themselves had made that contract, then each director, whether present or not at the time of taking such action, would be presumed to know what was done at that meeting, and this is a conclusive presumption and, if nothing to the contrary is shown, it will be presumed that all the directors assented to such action and, if Mr. Bowler assented to the continuing of the time of the fulfillment of this contract, either by an extension of such time, or by a new contract, we think the law is that he will be held to have assented to such extension of time. But we fail to see any agreement in the evidence for an extension of time. I have referred to the correspondence relating to such extension as is claimed—and this contract or this extension was entirely in correspondence—and I have made such reference in view of what I now have to say.

First a telegram was sent, suggesting that thirty days would be time enough to complete the contract. To that the Garland Chain Company answered that they were willing to give them an extension of thirty days in which to complete the contract. There is nothing in the evidence to show that the Cady Manufacturing Company had asked for thirty days, nor is there anything showing that they agreed to complete the contract in the thirty days. All that we find is suggestion that thirty days would be sufficient, and an offer to give that thirty days; nothing so direct as to show that the Cady Manufacturing Company had anywhere bound itself to complete the contract within the thirty days, nor to show that they had even asked for an extension of thirty days. Hence, under that state of facts, when the Garland Chain Company offered to give the thirty days, in order to make a binding contract it would be necessary for the Cady Manufacturing Company to accept that proposition. We see no acceptance in the bill of exceptions of that proposition, nor anything that may imply an acceptance.

The evidence complained of was introduced as bearing upon the question of notice, and, as we hold that N. P. Bowler had notice, as a conclusion of law, from facts not disputed in the record, such errors, if there were any, are not prejudicial.

There is an error in the judgment of the common pleas court in that Mr. Bowler is charged with too much interest. The testimony in the case shows that the Garland Chain Company was doing all it could to have this contract fulfilled, long after the time of expiration of the contract by its terms, the 6th day of November, 1895, and they made no demand upon Mr. Bowler, or anything that could be construed as a demand, until the fall of 1896, nor is there anything in the record to show that before that time they made any call for the return of the money they had paid and hence the money would not be due until about that time. December 8th, 1896, the Garland Chain Company wrote a letter to N. P. Bowler in which they say that they have been informed of the assignment of the Cady Manufacturing Company and ask for the return of the money paid to it. Up to that time the Garland Chain Company was exercising patience with the Cady Manufacturing Company and trying to get the machine, instead of having the money returned, and, until then, there was no notice to any one that they demanded the return of the money, and interest should commence to run on the amount advanced by the Garland Chain Company from the 8th of December, 1896, and the judgment of the court below is modified so as to exclude all and any interest prior to that date.

With this modification the judgment of the court below is affirmed.