[No. 8611.]

National Surety Company v. Canon, Treasurer, of Mesa County.

1. Principal and Surety—*Construction of Surety's Contract*, is to be made according to the every day meaning of the words used.

Defendant was surety to the county treasurer for deposits which he should make in a certain bank. *Held*, liable to the treasurer not only for money deposited, but for whatever was by the bank received and treated as money.

The bank having, for years, credited the treasurer with the amount of taxes assessed against parties having no deposit in the bank, the bank was held chargeable with the amount of said credits, and the surety of the bank, to the treasurer, also.

The bank having issued to the treasurer a deposit slip showing the deposit, failure to enter the credit in the books of the bank, was held immaterial.

2. BANKS—*Failure of Officers to Discharge Their Duties*, does not affect those dealing with the bank in a matter within the scope of its powers.

3. EVIDENCE—*Presumption*. Presumed that the directors of a bank are aware of and consenting to a course of business which has been carried on for many years. *De Baca v. Higgins*, 58 Colo. 75, distinguished.

4. ——*Judicial Notice*, taken that the greater portion of bank deposits are not money, but writings treated as money.

*Error to Mesa District Court.* Hon. THOMAS J. BLACK, Judge.

*Department.*

Messrs. McMULLIN & STERNBERG, for plaintiff in error.

Messrs. GRIFFITH, WATSON & SMITH, for defendant in error.

Opinion by Mr. JUSTICE TELLER.

The plaintiff in error was a surety on a bond of the Mesa County National Bank, to secure the defendant in error for such deposits as he might make as county treasurer in said bank.

On November 28, 1913, the bank was closed by a government examiner, and has not, since that time, been open for business.

The defendant in error, after the failure of the bank, brought suit on the bond, to recover the sum of $12,000 which, it is alleged, the treasurer had on deposit when the bank closed. The answer admits that there was on deposit the sum of $8,016.76, and denies that the deposit

was in excess of said sum. Subsequently the surety company paid to the treasurer the sum last mentioned, and the further sum of $1,474.80, the amount of the bank's taxes. The trial court found for the plaintiff and entered judgment in the sum of $2,508.44.

The dispute as to the amount on deposit arose out of the following state of affairs: Some days prior to October 8, 1913, Orson Adams, who was, at the time, president of said bank, and in the active management thereof, applied to the county treasurer to have made up for him, and brought to the bank, certain tax receipts, covering the taxes of the bank, two properties in which he was interested, and his own taxes, he promising, on receipt of the tax receipts, to give the county treasurer credit therefor on his account with the bank. On the 8th of October, the county treasurer's bookkeeper took the receipts to the bank, and gave them to Adams, and received from him a deposit-slip, on which, under the date aforesaid and under the title "checks," the following items were entered:

| | | |
|---|---|---:|
| "State | | $ 52.50 |
| Nat. | | 1,422.30 |
| Adams 15 & 16 | | 567.15 |
| " | " | 71.70 |
| " | 13-16 | 1,483.30 |
| " | " | 211.40 |
| O A | | 182.55 |
| | | 3,990.90" |

At the time of this transaction, Adams requested McClintock, the bookkeeper, to issue to him a certificate showing all taxes paid on the above described property, in accordance with the provisions of sec. 5696, R. S. 1908, *et seq.* The certificate was issued on that day or the next. The bookkeeper credited the treasurer's ac-

count with the bank, with the sum shown on said deposit-slip. After the bank closed its doors, it was learned that the treasurer's account on the books of the bank had not been credited with this deposit. Thereupon the matter was taken up with Adams, and he was requested to return the receipts. He did this within three days after the closing of the bank, and the notations on the treasurer's books, to the effect that the taxes had been paid on these properties, were erased. The receipts were perforatd and marked "cancelled" on November 30th. It appears from the testimony that, on the cancellation of the tax receipts for which the treasurer claims a right to credit, the practice is to paste the cancelled receipt over the duplicate receipt which is retained in the receipt book. Unless the duplicate is so pasted over, the treasurer is not given credit for a cancelled receipt. It was not so pasted over in this case; and the certificate was not returned.

It is agreed that the figures "15 & 16" and "13-16" refer respectively to two business blocks, the first known as the "Electric Building," and the other as the "Canon Block," both of which properties belonged to the Orson Adams Investment Company. It is also agreed that the first two items cover the bank's taxes.

The bank was a tenant in the Canon Block, and there was evidence that it owned seven-fifteenths of the stock of the Orson Adams Investment Company.

There was uncontradicted evidence which showed a custom on the part of the bank to request of the treasurer tax receipts covering the taxes of various persons and corporations, and, upon deposit of such receipts to give the county treasurer credit for the amount thereof. This custom was shown to have existed as far back as 1898; and during the four years in which the defendant

in error had been treasurer, such had been the bank's practice in paying taxes for itself and others.

The question presented by this writ of error is whether or not the bank became liable for the sum named in said deposit-slip.

Plaintiff in error contends that the surety is liable only according to the strict terms of the bond for money deposited with the bank, and urges that in this case there was no money deposited.

We cannot agree with this contention. The terms of the bond are to be construed according to their everyday meaning. It is common knowledge that the greater portion of deposits in banks are not made of money, but of instruments which are treated as money. The plain meaning of this bond is that the surety company shall be liable for such sums as the bank receives as money, and for which it does not account. This transaction was not peculiar, it being a natural method of paying taxes by the bank. It would have been an idle ceremony for the bank to pay the bookkeeper money which he would naturally immediately return to the bank for deposit. We think, therefore, there was no error in admitting the deposit-slip in evidence.

It is further contended that Adams had no authority to credit the treasurer with these sums as paid for taxes by persons or concerns which had not on deposit the amount of money required to pay the taxes.

The defendant in error upon this point relies on the evidence of the payment of taxes in this manner for many years. Plaintiff in error quotes extensively from the authorities to show that the evidence is not sufficient to establish a custom. This, however, is not the intent of the evidence. It is only necessary in this case to produce evidence which shows an acquiescence in this practice by the managing officers of the bank. This requires evi-

dence not of a general custom, but of a practice or usage by the bank. If this method of payment has been going on for a series of years, it must be presumed that the directors of the bank were aware of it. In allowing it to continue, they ratified the past payments and authorized the officers to continue the practice. Nor do we think it important that the bank's books were not credited with the amount of this deposit. The deposit-slip was made by the president of the bank, who, at the time, was acting as receiving teller; and, under the authorities, a person dealing with the bank in a matter within the scope of its business is not required to see that the officers of the bank properly discharge their duties.

"The officers of a bank are held out to the public as having the general power to bind the bank according to the powers of the office as fixed by the general law and by the charter or the instrument that stands therefor, as well as by the by-laws of the bank when they are known to the person dealing with the bank. They are also represented by the bank to have the powers which are annexed to the particular office by the general usages and course of business applying to banks. * * * Granted, however, that the person dealing with the bank has no notice of the lack of the agent's power, and that the person claimed to be acting for the corporation is really its agent, for of course the bank is not responsible for the act of a person who is not acting for it, he may rely upon the agent's act, if it is not contrary to law and is within the general scope of the agent's usual authority." Zane on Banks and Banking, Sec. 96.

See also: *National Bank v. Burkhardt*, 100 U. S. 686, 25 L. Ed. 766; *Campbell v. National Broadway Bank*, (C. C.), 130 Fed. 699; *Martin v. Webb*, 110 U. S. 7, 28 L. Ed. 49.

In Mechem on Agency, 2nd Ed., Sec. 717, it is said:

"The methods of dealing of the particular principal may be material, frequently by way of estoppel as shown in a later section, but often also to show actual authority. For it is entirely clear that the continued conduct of the principal may be used to show how a grant of power was intended to be interpreted, and, further the voluntary acquiescence of the principal in the known course of conduct of the agent may serve to show that such conduct was in fact authorized. This does not depend upon estoppel but is an inference of fact to be drawn from conduct. It is, therefore, not essential—as it is in cases resting upon estoppel—that the other party shall have known of the facts at the time and relied upon them, but he may, as in other cases of actual authority, prove the authority though he was ignorant of it at the time of the act."

In *Scow v. Farmers Bank*, 136 Ia. 1, 111 N. W. 32, it is said:

"If a bank cashier or a bank president who is engaged in the active charge and control of the bank's business received at his usual place of business the money or credits of a customer either as a time deposit or for credit on open account, the bank becomes at once chargeable therewith, and the fact that the officer puts it down in his own pocket or converts it to his own use is no defense to an action by the depositor, if no collusion in the wrong appears on the part of the latter. The failure of the officer to make proper entry in the books, or his wrongful act in making an improper entry, is, so far as the depositor is concerned, the failure and wrong of the bank's own agent, and, under such circumstances, in the absence of guilty knowledge or collusion on the part of the depositor, the loss, if any, is its loss. 5 Cyc. p. 516, and note."

*Wasson v. Lamb,* 120 Ind. 514, 22 N. E. 729, 6 L. R. A. 191, 16 Am. St. 342, is a case very similar to the one at bar. There the treasurer deposited in the bank receipts for taxes of the bank from individuals in the bank, and from others, to the amount of over $2,000, and credit therefor was entered on the treasurer's pass book. He marked the taxes paid and charged himself with the collection. Credit for the taxes was not placed upon the bank's books until five days later. The bank soon afterwards failed and the treasurer undertook to collect the taxes, on the theory that they had not been paid. The lower court held that the taxes had been paid; that the deposit was complete when the tax receipts were delivered to the bank officers; that they were deposited as so much cash and so taken by the bank. The Supreme Court affirmed the judgment. Plaintiff in error attempts to distinguish this case by the fact that the deposit was made as money, by agreement between the bank and the treasurer; and that the treasurer had receipted for the money by checking it out; further, that the deposit had been entered on the pass book as a lump sum. We do not think that these facts distinguish the case. As we have already seen, the act of Adams was the act of the bank, and the issuing of the certificate in this case made the treasurer liable for the money.

The fact that the Indiana treasurer had checked out the money has no bearing upon this point. In each case, the important fact is that the treasurer, induced by an act of the bank, treated the taxes as paid, and became responsible for the amounts receipted for. Nor can we see that the fact that in that case there was no bond in suit has any effect upon the case as an authority.

For the reasons above stated in discussing the practice of depositing tax-receipts, it was not necessary for

the plaintiff below to plead the usage or practice, upon which he now relies.

We do not consider *DeBaca v. Higgins,* 58 Colo. 75, 143 Pac. 832, L. R. A. 1915B, 1091, as in point. There the president of the bank, during the absence of the cashier, gave to his personal creditor his check on the bank,—a draft signed by himself as cashier,—and a cer·tificate of deposit payable four months after date, which was also signed by him as cashier. It was held that the draft and the certificate of deposit were themselves notice to the creditor that his debtor was paying him with the funds of the bank; and that the creditor must have known that the issuing of these instruments was not a transaction with the bank, and not its business; but with the officer personally and in his business. This, the court holds, is the test, and such a payment is not good unless shown to have been authorized or subsequently ratified.

As we are of the opinion that the defendant in error, under a long established practice, was justified in treating the deposit of the receipts as payment of the taxes, and that the bank became his debtor, whether or not the proper entries were made upon its books, we do not find it necessary to consider the various other questions discussed in the brief.

Finding no error in the record, the judgment is affirmed.

*Judgment affirmed.*

Mr. JUSTICE WHITE and Mr. JUSTICE HILL concur.

Decided January 2, A. D. 1917. Rehearing denied March 5, A. D. 1917.