HEMON S. BLACKWELL *vs.* SADDLEBACK LUMBER CO.

Franklin.     Opinion September 11, 1930.

*Carll N. Fenderson,*
*Currier C. Holman,* for plaintiff.
*Frank W. Butler,*
*Cyrus N. Blanchard,* for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRINGTON, JJ. PHILBROOK, A. R. J.

PHILBROOK, A. R. J.    Action in assumpsit to recover an amount shown by account annexed to be $3,815.26. The case was submitted to an auditor who found that there was due from the defendant to the plaintiff the sum of $3,930, and that there was due from the plaintiff to the defendant the sum of $103.46, making a net balance of $3,826.54 due from the defendant to the plaintiff.

The defendant objected to the acceptance of the auditor's report for several reasons. Thereupon each side was permitted to introduce oral testimony and exhibits, and the case was reported to the Law Court.

The stipulations contained in the record are as follows:

"It is stipulated and agreed that this case is to be reported to the law court upon writ and declaration, pleadings, the auditor's report and defendant's objections to its acceptance, and legal evidence whether objected to or not.

No question is raised as to the sufficiency of the writ and declaration.

The plaintiff waives the presumption of a *prima facie* case made by the auditor's report, the report being admitted as evidence.

If the plaintiff is entitled to recover upon the evidence, damages shall be for the full amount stated in plaintiff's writ.

If the plaintiff is not entitled to recover, to become nonsuit."

The defendant corporation owned a mill in Dallas Plantation, Franklin County, Maine, erected and equipped for sawing hardwood logs into lumber. At the time of its incorporation, 1926, the plaintiff was the largest single stockholder in the company and at that time was employed by it as manager. This employment continued until June 1, 1928. During the lumbering operation in the winter of 1926-1927, he took his orders from Dr. H. C. Pitts, who was treasurer of the corporation from the date of its organization. In the spring of 1928 Harry F. Hardy, assistant treasurer of the company, came to Dallas and thereafter the plaintiff took his orders from Hardy.

There were two lots of land from which the company intended to take most of its logs, one being referred to in the record as the near piece and the other as the far piece.

In the logging season of 1928-1929, a contract was made whereby the plaintiff and one Gilbert Oakes were to cut certain hard wood and deliver it at the mill. The plaintiff testified that he had a conversation with Hardy about prices for doing the work and that Hardy told the plaintiff "it had been figured up that they couldn't figure they could pay more than fourteen dollars to sixteen dollars; fourteen dollars for the near and sixteen dollars for what is far."

The plaintiff also testified that he had a conversation with Hardy in regard to undertaking the operation with Oakes, telling Hardy that he didn't feel that he wanted to lose two or three thousand dollars on the hard wood; that he knew too much about it.

"Q. And what did Mr. Hardy then say to you?

A. He said 'the company won't see you lose anything.'

Q. What did you say to him then?

A. I said 'that is different.' I said 'I will take him (Oakes) up in the woods and show him the woods again."

It further appears that Oakes agreed to undertake the job with the plaintiff but "the agreement was that he would go in and take charge of the job and do the operation as long as he could see wages. When he couldn't make wages he would walk out."

Under this agreement, or understanding, they started the job in October, 1928, and some time in December, after working about two months, Oakes left, the reason being, to use his own words "because I couldn't make wages." After Oakes left, the plaintiff took charge of the camp for about two days and then put in a foreman by the name of Wallace Ham to take charge of the operation. The plaintiff continued the work and finished cutting about the middle of January, 1929.

As to amounts paid by the company, the record shows the following by the testimony of the plaintiff:

"Q. What was the price to be paid for the cutting on the strip that you showed Oakes, and that you and Oakes operated on first?
A. Fourteen dollars.
Q. And what advances were to be made; in what amount?
A. They were to advance eight dollars on the cutting and six dollars on the hauling.
Q. And during the winter were advances made?
A. Yes sir.
Q. Did the company advance to you more or less than these amounts?
A. More."

After the winter's work had been completed, the plaintiff says that the operation had cost him $3,815.26 over and above the amounts paid him during the winter by the company, which sum he says the company is bound to pay to him, basing his right to recover on the assurance given him by Hardy, above referred to, that the company would see that he did not lose anything.

According to the auditor's report, the plaintiff testified before

him that it was after Oakes refused to do any more this assurance was given on condition that the plaintiff would finish the work, but before the court below he testified that the assurance was given before the contract was entered into between Oakes and the plaintiff on the one hand, and the company, through Stacey, who had the power to make the contract, on the other.

Mr. Hardy was asked "Whether or not you ever had any conversation with Mr. Blackwell in the Fall of 1928 that the company would hold him — would see that he would lose nothing?" This would be before the Stacey-Blackwell Oakes contract. To this Hardy replied "I never had any talk with him about that; no sir." On being asked whether he had any conversation with the plaintiff after Oakes left, he said "I don't know but what I did. I can't remember; I probably did." He was not specifically asked whether, at the latter time, any assurance was given as now claimed by the plaintiff.

The defendant claims that it overpaid any amount due for the work done under the contract, that in completing his work the plaintiff did only the work which he was bound to do under his contract, even though working at a loss, that any agreement to complete the work after Oakes left was based upon no lawful consideration, and finally that if Hardy said what the plaintiff claims he said, which defendant does not admit, yet Hardy had no power, as agent for the defendant, to bind it by any assurance or lawful agreement to pay any loss sustained by the plaintiff.

From plaintiff's exhibit 3, an extract from the by-laws of the corporation, it appears that "The property and business of this corporation shall be managed by its board of directors, five (5) in number. Directors must be and remain stockholders." The record does not show that the plaintiff was one of those directors but it does show that he was familiar with the affairs of the company, financially and otherwise.

At a meeting of the directors held on March 29, 1928, provision was made for the appointment of an assistant treasurer "who may when necessary or proper sign checks, notes, or other evidences of indebtedness in behalf of the corporation, and endorse on behalf of the corporation for collection checks, notes and other obliga-

tions, and shall perform such other duties as may be assigned to him by the board of directors." The record shows no other duties to be performed by the assistant treasurer under assignment of the directors.

It is a familiar rule of law, as stated by this court in *Brown* v. *Weymouth*, 36 Me., 417, that the ordinary duties of a treasurer are to receive, safely keep, and disburse the funds of the company, under the supervision of the directors, but he has no authority to pay debts of the company, unless by order of the directors, nor to cancel, compromise or set off, claims due from the company by those due to it. Any attempt on his part thus to control the business of the company would be to assume powers specifically conferred by the charter upon the directors, and all such acts, unless ratified by the company, would be void.

We must therefore hold that Hardy had no express authority to bind the company under any assurance claimed by the plaintiff.

But the latter relies upon the principle of implied agency if no express agency be established.

It is well settled law that the relation of agency does not depend solely upon an express appointment and acceptance thereof, but may be, and frequently is, implied from the words and conduct of the parties and the circumstances of the particular case. The rule is well stated by Mr. Justice Harlan in *Martin* v. *Webb*, 110 U. S., 7; 28 L. ed., 49, where an implied agency on the part of a bank cashier to bind the bank was under consideration.

"As the executive officer of the bank, he transacts its business under the orders and supervision of the board of directors. He is their arm in the management of its financial operations. While these propositions are recognized in the adjudged cases as sound, it is clear that a banking corporation may be represented by its cashier — at least where its charter does not otherwise provide — in transactions outside of his ordinary duties, without his authority to do so being in writing, or appearing upon the record of the proceedings of the directors. His authority may be by parol and collected from circumstances. It may be inferred from the general man-

ner in which, for a period sufficiently long to establish a settled course of business, he has been allowed, without interference, to conduct the affairs of the bank. It may be implied from the conduct or acquiescence of the corporation, as represented by the board of directors. When, during a series of years, or in numerous business transactions, he has been permitted, without objection and in his official capacity, to pursue a particular course of conduct, it may be presumed, as between the bank and those who in good faith deal with it upon the basis of his authority to represent the corporation, that he has acted in conformity with instructions received from those who have the right to control its operations."

It has been held that agency may be implied from a single transaction, where the transaction has been ratified by the principal, or other factors appear which would thwart justice if the agency should be denied. A leading case upholding this doctrine is *Shoninger* v. *Peabody*, 57 Conn., 42; 14 Am. St. Rep., 88, where cases are quite fully cited, among which is *Billings* v. *Mason*, 80 Me., 496. But such agency is more readily inferable from a series of transactions, similar to those relied upon to prove the implied agency, and carried on through such sufficient time as to lead a reasonable man to believe that the agency exists.

Wigmore on Evidence, Sec. 377, says that the principle of proving implied agency, by citing other acts of the alleged agent, is that the instances must be numerous enough, and have occurred under conditions so similar, as to indicate a system, plan, or habit of doing that particular thing under similar circumstances; and the only question in administering the rule is whether the instances produced have any real probative value to show such a system, plan or habit.

As to the personnel of the parties who took an active part in the contract to cut and haul the logs, the plaintiff testified in cross examination:

"Q. From whom did you take the contract to cut the logs?

A. We took it that day between us.

Q. Who was with you?

A. Mr. Stacey.

Q. What do you mean by 'Between us'?

A. The three of us together.

Q. And what part did Mr. Stacey have in the program?

A. He and I together persuaded Oakes to take the job."

Again he testified that Stacey agreed to pay fourteen dollars.

"Q. And you took the contract for fourteen dollars?

A. Yes sir."

The plaintiff again stated, when asked "with whom was that trade made" that it was "made with Stacey and myself with Mr. Oakes," and the latter testified, when asked "with whom did you make your contract" that he made it with "Mr. Blackwell and Mr. Stacey." Mr. Hardy, testifying for the defense, said that he had nothing to do with the making of the Stacey-Blackwell-Oakes trade.

It should here be observed that, according to the undisputed testimony of Dr. Pitts, treasurer of the company, Mr. Stacey succeeded the plaintiff as general manager in the fall of 1928, and that "he was to be in entire charge of the operation; to build the mill; to let the contracts; in other words to do the entire work of the lumber operation for the Saddleback Lumber Company."

While other issues have been raised in the trial and argument of this case, it seems to be necessary to consider only two; one, an issue of fact, did Mr. Hardy say to the plaintiff what the latter claims was said; the other, an issue of law involving implied agency.

Regardless of what the auditor reported as testimony of the plaintiff relating to the time when the alleged guaranty against loss, which might be sustained, was made, the plaintiff stated, and reiterated in the stenographic report of the case, that it was made in the fall of 1928, before the Stacey-Blackwell-Oakes trade was made. His testimony is not corroborated. On the other hand it is denied by Hardy, and by the unnaturalness of a claim that when a person enters into a contract with a corporation, the terms of which are well defined, especially as to the consideration to be paid, any officer would attempt to bind the corporation to payment of any financial loss made by the other party in the performance of the contract.

Upon this issue of fact, the burden of proof resting upon the plaintiff, we are not persuaded that the latter has successfully sustained his task.

Upon the issue of law, the plaintiff has failed. A contract of guaranty against financial loss in a transaction like the one at bar involves elements of large importance. The number and similarity of other acts done by Hardy in a managerial capacity, as shown by the record, fall far short of establishing the claim of implied agency made by the plaintiff.

According to the terms of the stipulation, the entry must be

*Plaintiff non-suit.*
*So ordered.*