## SALEM TRUST CO. v. FEDERAL NAT. BANK et al.

### No. 3830.

District Court, D. Massachusetts.

May 21, 1934.

Pillsbury, Dana, Young & Moulton, Burnham, Bingham, Pillsbury, Dana & Gould, and Neil Leonard, all of Boston, Mass., for plaintiff.

Henry Parkman, Jr., John C. Coughlin, Parkman, Coughlin & Hannan, and Phipps, Durgin & Cook, all of Boston, Mass., for defendant Federal Nat. Co.

BREWSTER, District Judge.

This bill in equity is brought by the Salem Trust Company, now in possession of the commissioner of banks of the commonwealth of Massachusetts, to set aside a transfer of certain notes, mortgages, and other securities given as collateral to secure a note of $90,000 made by the Salem Trust Company, payable to the Federal National Bank, and to recover possession of such securities and to establish a trust in the proceeds derived from such collateral. The merits of the controversy were heard by Judge Lowell, who died before any decision had been handed down. Parties agreed to resubmit the case upon the transcript of testimony, exhibits, and briefs of counsel.

### Statement of Facts.

1. The Salem Trust Company (hereinafter referred to as the trust company) is a banking corporation organized under the laws of the commonwealth of Massachusetts, and until December 15, 1931, conducted business at Salem, Mass.

2. The Federal National Bank of Boston (hereinafter referred to as the national bank) is a national banking association organized under the laws of the United States, and until December 15, 1931, conducted a general banking business at Boston, Massachusetts.

3. The trust company used the national bank as its Boston correspondent and maintained an account subject to check in the commercial department of the national bank.

4. On December 11, 1931, the trust company was indebted to the national bank, by reason of an overdraft of its account, in the sum of $113,663.35. On that date the trust company, through Alfons F. Fischer, its treasurer, delivered to the national bank a note of the trust company in the sum of $90,000, together with various notes and mortgages payable to the Salem Trust Company as security for payment of its said note, the collateral having a total face value of $94,611.17.

5. The circumstances in connection with the giving of the note and the security therefor are as follows: On November 24, 1931, the Federal Reserve Bank of Boston refused to clear checks drawn on the trust company except upon payment of cash made at the time of presentation of its "Country Clearing Letter," so-called. Following a conference with the state bank commissioner and at the request of the president of the trust company, the national bank agreed to advance the funds necessary for the payment of these daily clearances upon the assurance of the president of the trust company that it would shortly be in funds sufficient to repay in cash the amount of these advances. As a result of these advances plus other withdrawals, the overdraft of the trust company steadily increased until on December 11, 1931, it had reached the sum as stated in the last preceding paragraph. The president of the national bank communicated almost daily with the president of the trust company, demanding that the overdraft be reduced by the payment of cash until on December 4, 1931, the national bank demanded that the trust company furnish collateral for the indebtedness arising out of the overdraft. The president of the trust company agreed to furnish this collateral and between that day and December 11 certain mortgages were turned over to the national bank. On the afternoon of December 11, after banking hours, the treasurer of the trust company came to the bank with various other notes and mortgages payable to the trust company which, with those already delivered, aggregated in amount $94,611.17. The national bank, because of the amount of work involved in rediscounting each separate item, requested the treasurer to execute a note for $90,000, and to pledge, as collateral therefor, the securities above mentioned. This was done voluntarily and without any compulsion or duress. The treasurer brought the collateral to Boston with the knowledge and consent of the president and vice president of the trust company, with the intention of having the proceeds of the note credited upon the overdrawn account. There was evidence tending to show that there was nothing unusual or inconsistent with good banking practice in taking the note of the trust company with collateral rather than rediscounting each item.

6. On December 12, 1931, the national bank credited the account of the trust company with the amount of its note, i. e., $90,000, thus reducing the overdraft by that amount. On December 12 and 14, various deposits and withdrawals were made by the trust company, so that at the close of business on December 14, 1931 (the last day on which both banks were open for business), the account of the trust company was overdrawn in the sum of $14,818.40.

7. On December 15, 1931, both banks failed to open for business. The comptroller of the currency on that date appointed Herbert Pearson receiver of the Federal National Bank of Boston, and the commissioner of banks for Massachusetts took possession of the Salem Trust Company. Both banks are in process of liquidation.

8. Upon the closing of the trust company and the national bank, the trust company was indebted to the national bank, in addition to the note of $90,000, for substantial amounts. Some of the indebtedness was secured by collateral and some unsecured.

9. At the time the note in question was given and the security hypothecated, the deposit liability of the trust company in its commercial department was about $500,000. The only assets remaining in its commercial department after the pledge were $50,000 in cash, a small balance in another trust company, and notes of the face value of $293,000, mostly unsecured. The loans for which the trust company had pledged se-

curities to the respondent exceeded the value of these securities. The officers of the trust company must have known that the company was insolvent. Whether the officers of the national bank knew, or had reasonable grounds for believing, that the trust company was insolvent is a question which Judge Lowell did not regard as material to the case, and evidence on that issue was excluded.

10. Of the notes and mortgages held as collateral for the $90,000 note, the receiver of the national bank has collected $42,397.64 on principal and $3,041.79 in interest, having compromised, by authority of this court and with the consent of the bank commissioner as per stipulation on file, certain of these items. The face value of the notes in his possession unpaid is $38,949.78. Of the amount collected $22,811.25 is being held by the receiver in "Trustee for Owner" account under stipulation with the complainant; the balance of the funds collected has been deposited by the receiver in his general account at the First National Bank of Boston, together with other funds realized from liquidation of the assets in his hands. From this account, the receiver has paid the expenses of administration, and from time to time turned over the surplus to the comptroller of the currency, to be distributed as dividends.

11. The $90,000 note was signed on behalf of the trust company by its treasurer, Alfons F. Fischer, who also on behalf of the trust company indorsed the commercial paper, signed and delivered the various instruments of transfer by which the securities were assigned as collateral for the note, as above stated. Mr. Fischer had been treasurer of the trust company since January, 1929. Under the by-laws of the trust company he was vested with all the powers prescribed by law as incidental to his position as treasurer and such duties and powers as the directors should expressly delegate to him. By vote of the directors of the trust company, passed November 14, 1929, Mr. Fischer, as treasurer, was authorized to borrow from the national bank "from time to time as the needs of the Bank might require." The trust company first established relations with the national bank in 1928, and from that time until the national bank closed the trust company had frequently secured credit by rediscounting notes and giving notes secured by collateral. These notes had always been indorsed or signed by Mr. Fischer as treasurer of

the Salem Trust Company. Prior to the vote of November 14, 1929, the action of Mr. Fischer in signing notes for the trust company had been approved and ratified by special vote. It was admitted at the trial that the notes of trust companies are usually signed by the treasurer.

### Conclusions of Law.

From the foregoing statement of facts, it is quite apparent that on November 24, 1931, less than a month before the trust company was closed, it entered into an arrangement with the national bank, with the approval, if not at the request, of the Massachusetts bank commissioner, which proved to be to the disadvantage of the depositors of the national bank. The Federal Reserve Bank had refused to clear checks drawn on the trust company except on payment of cash, and the national bank was requested to advance the necessary funds for these daily clearances. It agreed to do this upon the assurances that the trust company would promptly reimburse the bank. The necessary funds were advanced in accordance with the understanding, and on December 11 these advances, plus other withdrawals, had created an overdraft of over $113,000. If the transfer of the assets of the trust company is allowed to stand, even then one of the results of the arrangement is that the depositors of the National Bank will suffer a substantial loss. It appears, therefore, that the equities of the case lie with the respondent rather than with the complainant.

■ It is said that the national bank received a preference. Undoubtedly that is true, but the trust company was not in bankruptcy, and there is no rule of common law which declares unlawful a preference by an insolvent company. Cosmopolitan Trust Co. v. S. L. Agoos Tanning Co., 245 Mass. 69, 139 N. E. 806, 807. In this case the court observed that:

"In the absence of any inhibiting statute, a debtor commits no fraud by appropriating his property to the satisfaction of one or more of his creditors to the exclusion of all others. Knowledge by both the debtor and the preferred creditors is of no weight in this connection. * * *

"It is settled at common law that a debtor has a right to prefer one or more of his creditors over others."

■ Ordinarily, a preference of one creditor over others would not be deemed compatible with equity, but in view of the fact

that within a period of seventeen days the trust company had exhausted a credit of about $20,000 more than the face value of the securities pledged, it is doubtful whether in this case the preference would shift the equities over in favor of the complainant.

The situation which led the national bank to call for the deposit of collateral was created by the failure of the trust company to carry out its agreement with the bank. Notwithstanding this fact, the trust company now seeks to reclaim all such collateral in the hands of the receiver and to recover the proceeds of the collateral which has been liquidated. It bases its claim upon the alleged want of authority in the treasurer of the trust company to execute and deliver the note of $90,000 and to indorse over and assign the assets of the trust company which were hypothecated as security for the note.

■ Conceding that the principal business of the commercial department of a trust company is to loan rather than to borrow money (Compare Western National Bank v. Armstrong, 152 U. S. 346, 14 S. Ct. 572, 38 L. Ed. 470), it can no longer be doubted that the corporate powers of a Massachusetts trust company are broad enough to embrace the borrowing of money, and the power to borrow carries with it by necessary implication the right to secure its obligation. Hatch v. Coddington, 95 U. S. 48, 24 L. Ed. 339; Malaguti v. Rosen, 262 Mass. 555, 160 N. E. 532.

Under the laws of Massachusetts its corporate powers are exercised by its board of directors. The statutes provide for the election of a treasurer by the board of directors. The duties of its treasurer are not prescribed by law, but by the by-laws of the corporation he was vested with all the authority incident to his office and such other powers as might be delegated to him by the board of directors. He was the principal fiscal officer and the scope of his authority is not unlike that of a cashier in a national bank. The extent of this authority is well defined in Martin v. Webb, 110 U. S. 7, at page 14, 3 S. Ct. 428, 433, 28 L. Ed. 49, where the court states:

"It is quite true, * * * that a cashier of a bank has no power, by virtue of his office, to bind the corporation except in the discharge of his ordinary duties, and that the ordinary business of a bank does not comprehend a contract made by a cashier,—without delegation of power by the board of directors,—involving the payment of money not loaned by the bank in the customary way. Bank of United States v. Dunn, 6 Pet. 51 [8 L. Ed. 316]; United States v. City Bank of Columbus, 21 How. 356 [16 L. Ed. 130]; Merchants' Nat. Bank v. State Nat. Bank, 10 Wall. 604 [19 L. Ed. 1008]. Ordinarily, he has no power to discharge a debtor without payment, nor surrender the assets or securities of the bank. * * * As the executive officer of the bank, he transacts its business, under the orders and supervision of the board of directors. He is their arm in the management of its financial operations. While these propositions are recognized in the adjudged cases as sound, it is clear that a banking corporation may be represented by its cashier,—at least where its charter does not otherwise provide,—in transactions outside of his ordinary duties, without his authority to do so being in writing, or appearing upon the record of the proceedings of the directors. His authority may be by parol and collected from circumstances. It may be inferred from the general manner in which, for a period sufficiently long to establish a settled course of business, he has been allowed, without interference, to conduct the affairs of the bank. It may be implied from the conduct or acquiescence of the corporation, as represented by the board of directors. When, during a series of years or in numerous business transactions, he has been permitted, without objection, and in his official capacity, to pursue a particular course of conduct, it may be presumed, as between the bank and those who in good faith deal with it upon the basis of his authority to represent the corporation, that he has acted in conformity with instructions received from those who have the right to control its operations."

See, also, Fleckner v. Bank of United States, 8 Wheat. 338, 357, 5 L. Ed. 631; Merchants' Nat. Bank v. State Nat. Bank, 10 Wall. 604, 19 L. Ed. 1008; Lanning v. Lockett (C. C.) 10 F. 451; Barnes v. Ontario Bank, 19 N. Y. 152; Donnell v. Lewis County Savings Bank, 80 Mo. 165; Farmington State Bank v. Delaney, 167 Minn. 394, 209 N. W. 311, 46 A. L. R. 1495; Montgomery Bank & Trust Co. v. Walker, 181 Ala. 368, 61 So. 951.

■ The earlier course of dealing between these two banks in which the treasurer had always acted on behalf of the trust company was sufficient to ground a bona fide belief on the part of the national bank that

the treasurer was duly authorized, not only to sign the note, but also to indorse and assign the security.

But the respondent bank does not have to base its rights to the security only upon implied authority of the treasurer. In 1929 the directors, by vote, authorized the treasurer to borrow from the national bank from time to time as the needs of the trust company might require. The authority conferred by this vote had never been revoked; on the contrary, the treasurer had exercised his authority more than once in his dealings with the national bank.

It is the complainant's contention that the transaction did not constitute a borrowing within the meaning of the vote, but rather it was a transfer of assets to secure a pre-existing indebtedness. No doubt, on December 11, 1931, the trust company was indebted to the national bank, the indebtedness being then represented by an overdraft on the books of the national bank. The legal effect of the $90,000 note was to change the form of the indebtedness. To the extent of $90,000 the overdraft was paid, and to that extent it extinguished a pre-existing indebtedness. Stebbins v. North Adams Trust Co., 243 Mass. 69, 73, 136 N. E. 880.

In my opinion it does not follow that the action of the trust company was unauthorized. If, instead of crediting the commercial account of the trust company with $90,000, the National Bank had actually paid to the trust company the $90,000, it could hardly be denied that the trust company had borrowed $90,000 on its secured note. If the $90,000 had been applied on the overdraft, the character of the act would not be affected by this disposition of the proceeds of the loan. I can see no sound basis for distinction between paying the cash and placing the amount to the credit of the trust company on the books of the national bank. In either case, a pre-existing indebtedness would be paid. The law does not require futile or needless formalities.

I am not persuaded that the complainant has made out a case entitling it to set aside as void the note or the pledge of collateral. The transaction was entered into in good faith by both parties; at least, the transaction cannot be regarded as one tainted with fraud merely because it resulted in a preference. On the question of authority, I am of the opinion that the

transaction came within the scope, not only of the treasurer's ostensible authority, but within the scope of the authority conferred upon him by vote of the directors.

It follows that the bill of complaint must be dismissed.